Robert E. QUARLES et al., Plaintiffs,

v.

OXFORD MUNICIPAL SEPARATE
SCHOOL DISTRICT et al.,
Defendants.

No. WC 69–62–K.

United States District Court,
N. D. Mississippi, W. D.

Nov. 7, 1972.

Lewis Myers, Jr., Oxford, Miss., for plaintiffs.

Will A. Hickman, Oxford, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

Suing on behalf of black students, plaintiffs have moved for supplemental relief in this school desegregation case to require defendant school officials to furnish free bus transportation to elementary students currently attending the district's two elementary schools and residing more than one and one-half miles from the school attended. The instant motion filed August 8, 1972, is the only court action which has occurred in the Oxford school case since the entry of the court's comprehensive desegregation order on January 8, 1970.

A statement of certain background facts is necessary to place the case in proper focus. The school district comprises not only the corporate limits of the City of Oxford but approximately 90 additional square miles of added territory in Lafayette County, Mississippi. School litigation began July 17, 1969, when the plaintiffs, representing black parents and students of the community, complained that the Oxford schools which were operated on freedom of choice had not become effectively desegregated. The court on January 8, 1970, in accordance with current Supreme Court decisions, entered an order abolishing the previously existing dual school system, pursuant to which four school buildings were to be utilized commencing with the start of the second semester February 3, 1970. Accordingly, all students enrolled in grades 1, 2 and 3 were assigned to Bramlett Elementary

School (formerly white); all students in grades 4, 5 and 6 were assigned to Oxford Elementary School (formerly white); all students in grades 7, 8 and 9 were assigned to Oxford Junior High School (formerly black); and all students in grades 10, 11 and 12 were assigned to Oxford High School (formerly white). All other school facilities were closed. Following two weeks' recess for reorganization, the Oxford schools then reopened on a fully unitary basis. The record indicates a remarkable degree of community support took place for this radical change in operating the city schools, which were approximately 55% white and 45% black; that parents of both races, teachers and students alike, and in fact all segments of the community rallied to meet the crisis so that upon school reopening in February 1970 more than 90% of the enrolled students remained in the system, with a remarkably small amount of attrition or flight to private schools. From that time until the present, there has existed continuing support from the entire community involving many persons of both races who have worked faithfully and with dedication to make integrated education at Oxford a successful reality. Student activities and functions, administration, staff and all classrooms are and have been since February 1970 fully integrated; one-race schools have been altogether eliminated and are a thing of the past.

The defendant district is one which traditionally has had a bus transportation system for certain students as provided by Mississippi statutes. Of a present enrollment of about 2675 students, 1174 are eligible for free transportation, inasmuch as they reside outside the corporate limits of Oxford, a distance of one mile or more from the school attended but within the added territory of the school district.[1] Through this state aid the district has been able to acquire and maintain 20 buses which it operates each school day to deliver the eligible children to the four schools operated by the district.

Oxford, a municipality of approximately 6700 residents,[2] has experienced corporate growth in recent years. Beginning in 1964 there were notable expansions of the municipal boundaries to the west, south, and other areas of the city. As a result of these extensions, the greater part of which occurred at least five years ago, the school district suffered substantial reduction in state transportation funds since the State Board of Education, under the cited statutes, was relieved of any obligation to provide transportation to those students brought within Oxford's corporate limits, irrespective of the distance urban students might live from the school attended. Although the evidence did not show exact number of students thus affected, the local school board as a matter

1. Eligibility of state aid for transportation of pupils is provided by Miss.Code Ann. § 6336–04, reading in part:

"Only those pupils of legal school age and in actual attendance in the public schools who live a distance of one mile or more by the nearest traveled road from the school to which they are assigned, shall be entitled to transportation within the meaning of this act. Pupils who live within the corporate limits of a municipality and who are assigned to a school within said corporate limits shall not be considered as eligible for transportation within the meaning of this act . . . ; provided, however that those pupils included within the corporate limits of a municipality because of an extension of the corporate limits of such munici-

pality who are otherwise entitled to transportation shall remain eligible for transportation within the meaning of this act for the balance of the fiscal year during which such municipal limits are extended."
§ 6336–07 provides in part:
   Only pupils who are entitled to transportation shall be reported in the proposed plans, and it shall be unlawful for the state board of education to allot any state funds to any county or municipal separate school district with added territory for the transportation of pupils who are not entitled to such transportation."

2. The University of Mississippi, with almost equal population of students, faculty and other personnel residing on campus, is located just outside the city limits.

of policy continued until May 1969 to transport free of charge those students brought within the city limits but formerly eligible for state transportation funds. Initially the practice or custom of busing some students without reimbursement from the state began because the school district already had equipment and facilities to afford the service. In May 1969, however, the school board discontinued the policy of transporting all students ineligible for public transportation under state law. This decision was not racially motivated but was based upon objective, concrete reasons: first, aging of the buses made it necessary to retire vehicles from service and reduce the size of the fleet; second, the demand for unreimbursed transportation was unabated since an increasing number of students wanted transportation at public cost deemed to be wholly beyond the local school district's financial capacity; and third, no prospect of state assistance rendered immediate action imperative. Thus, the school board adopted a resolution discontinuing, effective September 1969, the informal practice of transporting all students residing within the corporate limits. The public was at once notified of this action and the underlying reasons. At the time there were registered objections, particularly from black citizens who were concerned about transporting their children assigned to "freedom-of-choice" schools then being operated by the district. The court finds from the evidence that under the former system there were both black and white students of unspecified number residing more than one mile from their schools who had to provide their own transportation—a burden clearly traceable to the operation of the State's school transportation laws and not at all attributable to racially motivated actions of local school officials.

Immediately upon the implementation of Oxford's unitary school system, students in the first three grades were assigned to Bramlett, which is centrally located in the city. Oxford Elementary School, to which grades 4, 5 and 6 were assigned, was then located on Jackson Street near the town's commercial center; this building was used until June 1971. At that time Oxford Elementary was moved into a new structure on a site in the northeast quadrant of Oxford, the old school plant having been sold to the United States as a site for a new Federal Building. Thus, the two schools at first utilized for the six elementary grades were as equally well located to serve the whole community as had been the case with the freedom of choice elementary schools under the dual system.

Current, reliable surveys indicate that there are 418 students (142 blacks and 276 whites) enrolled in the two Oxford elementary schools who reside 1½ miles or more from the schools that they attend. This comprises 11 black students and 81 white students attending Bramlett, and 131 blacks and 195 whites attending Oxford Elementary School. The record reflects without dispute that for some of these elementary students to get to school, it is necessary, if they walk, to traverse certain areas where there are no sidewalks and proceed along highways, thus subject to ordinary hazards of travel. In point of fact, however, few children of either race who live beyond walking distance actually walk to school but are provided private transportation either by parents or by groups of interested citizens. Certain black parents in large families experience economic hardship because of the cost incurred weekly for private transportation of their children to school.

A careful study of the maps in evidence reveals that, given the present locations of the unitary schools, which now operate on a city-wide grade basis, certain students of both the black and white communities reside nearer the elementary schools under the present arrangement than they did in the days of freedom of choice. This is true as to black students residing in the Eastview Homes area, Burney Branch area, and white neighborhoods in east Oxford.

As to students residing on the west side of Oxford, as in Tidwell Grocery area, the old central high area (both black neighborhoods), as well as substantial new subdivisions of white residency in West Oxford, they are materially further away from Bramlett and Oxford Elementary Schools than in the days of the dual school system. The documentary evidence clearly shows that the white and black populations are scattered throughout all portions of Oxford and in general no burden is thrown upon one race greater than the other as a result of converting from the dual to a 100% unitary school system. Moreover, when the population as a whole is considered, desegregation has not resulted in increased burdens for elementary children to get to school.

The undisputed evidence is that it would cost the district approximately $89,000 to provide free transportation for the 418 students encompassed by plaintiffs' motion, requiring the purchase of 8 additional buses at a cost of $7,000 each, or $56,000, requiring the payment of additional salaries of $10,400 for drivers and other help, necessitating additional operational costs of $10,000, and hiring an additional shop mechanic at $7,000. Bus routes to the district schools would necessarily have to be routes terminating at all four schools. The district's budget for the current year is $1.6 million.[3] Thus, plaintiffs' demands for public transportation involve costs amounting to 5.6% of the total school budget, entailing a per pupil outlay of $215, no part of which is subject to state reimbursement. To make expenditures of this character the school officials will be required to make savings elsewhere. The likelihood is that plans will be cut back on vocational technical education which the school officials rate as a dire need to prevent school dropouts, as well as curtailment of special education classes and elimination of art, music and other enrichment courses.

Notwithstanding difficulties encountered by some children of both races in getting to Bramlett and Oxford Elementary, the record indicates that excellent attendance has been achieved at both schools, with more than 95% of the enrollment being in average daily attendance.

At no time since the establishment in February 1970 of the Oxford unitary school system has there been complaint by any student, faculty member or parent asserting that the operation or administration of the schools has been racially motivated or a lack of compliance with the desegregation order.

Counsel for plaintiffs assert that public transportation must be provided under the well-known Supreme Court decision of Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); the decisions of the Fifth Circuit in United States v. Greenwood Municipal Separate School District, 460 F.2d 1205 (5 Cir. 1972); Brown v. Board of Education of City of Bessemer, Alabama, 464 F.2d 382 (5 Cir. 1972), as well as the decisions of this court in Edwards v. Greenville Municipal Separate School District, No. GC 70-8-S (N.D.Miss. June 24, 1971), and Henry v. Clarksdale Municipal Separate School District (N.D.Miss. September 25, (1972). Yet, they candidly admit that in no case has any court ordered bus transportation in the context of the present factual situation. Plaintiffs argue that the entire issue of public transportation rests upon distance, pure and simple, and if an elementary student, especially one of the black race, attends a public school beyond walking distance, the Constitution mandates he be given a free ride. In reply, counsel for the school district urge

---

3. As of July 1, 1972, the district had a carryover of $70,000. This balance, however, is subject to outstanding liabilities of $10,000 unpaid bus notes, costs of $23,000 incident to reassessing outside property in the school district, and $30,000 for excess costs on the vocational technical building presently under construction.

that the *Swann* principle is wholly inapplicable to Oxford since successful desegregation was at once produced through assignment of students not requiring transportation, and hence it is either necessary nor appropriate for a district court to order student transportation at public cost under such circumstances.

The issue is one of considerable moment in view of the current clamor of often conflicting opinions, both judicial and extra-judicial, addressed, in the wake of *Swann*, to the problems and effects of massive transportation of students.

This court concludes that Oxford is different from Charlotte, North Carolina, from Clarksdale, Greenwood and Greenville, Mississippi, from Bessemer, Alabama, and from other school cases in which courts have decreed transportation for elementary students as an appropriate tool to dismantle a de jure dual school system. This distinction rests upon several solid, uncontradicted facts. First, Oxford does not have a history of resistance to court integration orders or for devising assignment plans that promise much but achieve little. On the contrary, as a result of a single order entered by this court, the school district did away with every vestige of the dual school system, and it did so within no more than two weeks' time. The evidence unmistakably shows that Oxford was successful to an astonishing degree in putting an instant end to its de jure dual schools and fully realizing unitary schools. This is in sharp contrast to those school districts which have manifested either stubborn and defiant attitudes in complying with the constitutional mandate or have advocated plans of limited, and often small, success. Oxford has no history of court-imposed orders to break up the dual system. Secondly, the Oxford board rejected any thought of attempting to zone the city geographically, in either contiguous or noncontiguous zones, and thus persist in teaching the same grades in different buildings situated in racially different neighborhoods. Instead, the board decided it would effectively cope with all desegregation problems by utilizing its four school buildings on a city-wide grade basis; and, as conceded by plaintiffs' counsel, there has been from the start a truly unitary system whereby each school enjoys full and effective desegregation. Thirdly, the assignment plan adopted by the board was widely supported by the entire local community so that no one-race schools remained (not true in many heavily black school districts). Finally, this successful desegregation was accomplished without a noticeable increase in the burden of students in elementary grades getting to school as compared with that in attending dual schools operated in the freedom-of-choice area.

Plaintiffs' claim is predicated upon the naked proposition that when the court enters a desegregation order, if elementary students are required to walk beyond reasonable walking distances to the schools assigned, the Constitution requires they be given free public transportation. In invoking *Swann*, plaintiffs may not ignore that the federal district court at Charlotte was confronted with the apparently vain and continuing unsuccessful efforts to the local Board of Education to dismantle de jure racially segregated schools, and to do so, it became necessary for the court to order the movement of substantial numbers of students from one neighborhood to another, thus eliminating many one-race schools and achieving biracial student bodies. It was only in this factual context that the Supreme Court upheld the action of the trial judge in invoking massive public transportation of students as an appropriate tool to accomplish desegregation, for without moving large number of students substantial distances across town, it was impossible to break up established patterns of racially segregated school attendance. The Fifth Circuit has been most faithful to *Swann*, many times directing this and other district courts to reexamine all school assignment plans in the light of

the principle of that case. In *Greenwood* and *Bessemer, Swann* was applied to require busing of students zoned to attend schools out of their neighborhood; in each district, other measures had been declared ineffectual to dismantle one-race schools. Similarly, in *Greenville* and *Clarksdale,* this district court invoked the *Swann* principle to require busing students attending elementary grades when assigned away from their neighborhood elementary school to attend a distant elementary school. In *Greenwood* this was in the context of the black children residing in Baptist Town being transported to the all-white Bankston Attendance Center after they were assigned in a noncontiguous zone with Bankston residents. In *Clarksdale,* principally black students from south Clarksdale and in other black areas of the city were ordered transported to the formerly white Kirkpatrick, Heidelberg and Oakhurst Elementary Schools on the west side of Clarksdale; this, too, in a context where the same grades were taught in different racial neighborhoods. In *Greenville,* our colleague, Judge Smith, ordered public transportation for certain elementary students in the southern part of the city when zoned to attend an elementary school outside of their immediate neighborhood, and the same grades were taught in different school buildings throughout the city. As this court perceives the rule, the *Swann* principle and the Fifth Circuit's unwavering adherence to it is that public transportation for elementary students is appropriate wherever it is a desegregation necessity, i. e., a new burden is thrust upon such students as the proximate result of the Constitution's demand for unitary schools; otherwise, *Swann* would not appear to be logically pertinent to school operation.

The ultimate question is whether *Swann's* principle, holding that free bus transportation is appropriate under certain circumstances, must be taken to mean that, regardless of the degree of the desegregation success that a school district has had, students who reside more than walking distance from their homes must nevertheless be bused to school at public expense.

Counsel for plaintiffs would broadly interpret *Swann, Greenwood* and *Bessemer* to embrace a requirement for free transportation irrespective of whether desegregation has added to the burden of students getting to school; and that the entry of a desegregation order triggers the case for such transportation. Rejecting this contention as an overly generous reading of *Swann,*[4] this court proclaims that the sole legitimate purpose of a federal court issuing a busing order is to achieve desegregation, making it reasonable to utilize such a tool when other desegregation methods fail and it becomes necessary to transport substantial numbers of children for great distances to dismantle one-race schools. Although some day higher courts may hold that every student has a constitutional right to be afforded free transportation if he attends a school beyond reasonable walking distance, such a holding cannot be in the context of desegregation necessity, but would have to rest upon some independent claim of right not presently judicially cognizable.

This court notes that it is quite odd that Mississippi statutes do draw a distinction between transportation aid granted to the rural student and denied to the urban student, even though both may reside equally distant from the school attended. Indeed, it appears at first blush that this classification ought to bear analysis in terms of equal pro-

4. We do not overlook the broad language of the Fourth Circuit in Brewer v. School Board of the City of Norfolk, Virginia, 456 F.2d 943 (1972), where the Court was again concerned with City of Norfolk schools which had long been in federal court litigation relating to a number of desegregation plans. Judge Russell, in imposing a duty to transport students who "live beyond normal walking distance from the school to which they are assigned", recognized that the district court's equity power existed only "to require transportation whenever and wherever necessary to disestablish a dual school system." 456 F.2d at 947.

tection standards, but in a context that is nonracial and unrelated to desegregation and in litigation of an entirely different character from the case at bar. Further comment is inappropriate since this court is not presently organized nor are the proper parties before it to entertain such a challenge.

This court, therefore, holds that bus transportation should not be provided students in Oxford in view of the successful achievement of a unitary school system which was accomplished without an increased burden upon elementary students in getting to and from school, and it would be an unjustified and indefensible exercise of federal judicial power to throw upon this school district substantial financial obligations in transporting urban students merely for their convenience, and not as a desegregation necessity. Consequently, plaintiffs' motion is denied.

This Memorandum Opinion shall suffice for findings of fact and conclusions of law as required by Rule 52 of F.R. Civ.P. and replaces oral findings made from the bench at the conclusion of the evidentiary hearing.