**Horace Willie MONTGOMERY, et al.,
Plaintiffs-Appellants,**

v.

**STARKVILLE MUNICIPAL SEPARATE
SCHOOL DISTRICT,
Defendant-Appellee.**

No. 87–4478.

United States Court of Appeals,
Fifth Circuit.

Sept. 9, 1988.

Wilbur O. Colom, Mary Beverly Borroura, Mitchell Frantilin, Colom & Colom, Columbus, Miss., for plaintiffs-appellants.

Lydia Quarles, Dolton W. McAlpin, McAlpin & Quarles, Starkville, Miss., for defendant-appellee.

* Circuit Judge of the Second Circuit, sitting by

Before VAN GRAAFEILAND,* JOHNSON and JOLLY, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Appellants, twelve Starkville, Mississippi students, by their parents and next friends, appeal from a portion of the judgment of the United States District Court for the Northern District of Mississippi (L.T. Senter, Jr., C.J.) which denied appellants' claims of racial discrimination by Starkville Municipal Separate School District (the "district"). For the reasons that follow, we affirm.

The Supreme Court's landmark decision in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), precipitated a spate of lawsuits alleging racial discrimination in schools. One of those lawsuits was the instant case, begun in 1969. In an order dated February 5, 1970, the district court enjoined the school district from operating a dual school system and from discriminating on the basis of race or color in the operation of its schools. The district court retained jurisdiction of the case so that it could monitor compliance with its order.

In 1983, appellants applied to the district court for leave to intervene, alleging numerous violations of the district court's orders. The application was granted, and the case was tried before Chief Judge Senter, who held in favor of the district on most of the issues raised in the pleadings. The only adverse holdings that appellants challenge in this Court concern the district's use of achievement grouping in certain subjects and grades and a so-called "VIVA" program for talented students. We find no error in either holding.

## ACHIEVEMENT GROUPING

Following the 1970 order, the district promptly integrated its schools, and, as the district court found, "[f]acilities and educational programs were opened up to all students regardless of color." For a number of years prior to such integration, the district schools had followed the practice of

designation.

grouping children in the several grades on the basis of their scholastic achievements. For example, the more scholastically advanced third graders would be placed in a different group than the less advanced. With the approval of a supervisory bi-racial committee and the district court, this practice was continued in the integrated schools. For the first few years after integration, students were given comprehensive tests for the purpose of grouping, and they were placed in separated groups for the entire day. High school students were grouped only in English.

In 1972, this system was changed when the district introduced a modified open-classroom concept in its schools. This was accomplished by removing the walls between two or three adjoining classrooms and combining them into one, with anywhere from fifty to eighty students in the then single unit. Their numbers were divided as equally as possible between blacks and whites. However, in two subjects, English and Math, it was felt that a program of grouping should be continued. As explained by Dr. Nolan Vickers, former district superintendent, the reason for this was that these two subjects required "skill mastery". "A course requiring skill mastery," he said, "would be something like mathematics, which would require the mastery of a certain skill, such as addition, subtraction, before you went on to the study and accomplishment of subsequent skills such as multiplication, division or whatever. In other words, the mastery of one skill is required before a child can go to the next level of mastery." Similarly, in English, a student must have mastered simple "Jane and John" texts before moving up the hill towards Shakespeare.

The district did not believe that skill mastery was required in such courses as science and social studies. However, as Dr. Thomas Saterfiel, Deputy Superintendent of Education for the State of Mississippi, pointed out, "[t]he reading and math type subjects are the basic skills that everything else is built on."

At the present time, achievement grouping in English and Math is in effect in district classes up to and including the sixth grade. Students in grades between seven and twelve select courses on a voluntary basis. Students in the lower grades are grouped on the basis of their achievements in English and Math into one of three groups, and for approximately 40 percent of the school day, students are taught in appropriate groups in these two subjects. However, Dr. Vickers testified that "there [is] no time during the day that black and white students [are] not together in the classroom, be it big or small, with other students."

There is nothing unique or unusual about the concept of achievement grouping. Dr. Saterfiel testified that other Mississippi school districts group in this manner. Indeed, a review of scholarly literature in the field of education shows that grouping is a widely used pedagogical practice in basic courses such as English and Math. *See, e.g.,* Harris and Sipay, *How to Increase Reading Ability* 103 (7th ed. 1980) ("The major part of reading instruction in the elementary schools of the United States is carried on in groups."). *See also Georgia State Conference of Branches of NAACP v. Georgia,* 775 F.2d 1403, 1418 (11th Cir. 1985); *United States v. Texas,* 342 F.Supp. 24, 31–32 (E.D.Tex.1971), *aff'd,* 466 F.2d 518 (5th Cir.1972). Moreover, the practice of achievement grouping is not, per se, unconstitutional. *Castaneda v. Pickard,* 648 F.2d 989, 996 (5th Cir.1981). Under proper circumstances, courts have approved the practice. *Castaneda by Castaneda v. Pickard,* 781 F.2d 456 (5th Cir. 1986) (*Castaneda, supra,* following remand); *Morales v. Shannon,* 516 F.2d 411 (5th Cir.), *cert. denied,* 423 U.S. 1034, 96 S.Ct. 566, 46 L.Ed.2d 408 (1975). Indeed, in some cases, courts have directed the use of special groups, particularly where concentrated remedial counseling is required to overcome language difficulties. *Milliken v. Bradley,* 433 U.S. 267, 283–88, 97 S.Ct. 2749, 2758–61, 53 L.Ed.2d 745 (1977); *United States v. Texas,* 447 F.2d 441, 448 (5th Cir.1971), *cert. denied,* 404 U.S. 1016, 92 S.Ct. 675, 30 L.Ed.2d 663 (1972); *United States v. Texas, supra,* 342 F.Supp. at 31–

32. *See also* 20 U.S.C. §§ 3222(a)(B); 3223(a)(4)(B) & (D).

However, in the early post-*Brown* years, when the process of desegregation was still in its infancy, this Court made it clear that constitutionally mandated desegregation could not be circumvented through the device of transferring pupils from segregated schools into schools with segregated grades. We held in substance that any testing and grouping of students that had a significant racially segregative impact could not be employed until a school district had operated a unitary system long enough to demonstrate that the impact in question was not the result of past segregation or, alternatively, that testing and grouping would remedy such result through better educational opportunities. *Castaneda v. Pickard, supra,* 648 F.2d at 994; *United States v. Gadsden County School District,* 572 F.2d 1049, 1051–53 (5th Cir.1978); *McNeal v. Tate County School District,* 508 F.2d 1017, 1020 (5th Cir.1975).

In a thorough and well-reasoned opinion, 665 F.Supp. 487, Chief Judge Senter demonstrated a complete knowledge of the facts and a full understanding of the law. He found that the district had achieved and maintained unitary status for a sufficient period of time (almost sixteen years) that the "minimal segregative effect" of its grouping practices did not reflect either the effects of past segregation or a contemporary segregative intent. He found also that minority students were not locked into their achievement groups but were likely to move upward and improve over the years and that the "minimal segregative effect" was outweighed by the better educational opportunities afforded the students.

Judge Senter recognized that, although the norm-based standardized test results used by the district were not, standing alone, the best way to measure the progress of individual students, other grouping criteria had been eliminated at the insistence of the Office of Civil Rights. He held that the existing testing system as thus limited by OCR passed muster. However, he authorized the district to also use teacher and counselor input if it wished to do so.

We hold that Chief Judge Senter's findings and conclusions have ample support in the record. Like the district judge, we are impressed particularly with the testimony of Dr. Saterfiel, whose qualifications as an expert were unassailable. Dr. Saterfiel drew a clear distinction between "achievement" grouping, which was used in the district, and "ability" grouping, which was not used. He said that ability grouping is done on the basis of intelligence determined by some sort of IQ test and that the students are grouped according to their apparent intellectual abilities. Achievement grouping, on the other hand, groups children according to specific common needs and objectives based on their skill mastery of a subject at the time of grouping. All the students in a group, he said, are studying "common content." In Dr. Saterfiel's opinion, achievement grouping is far superior to ability grouping.

Dr. Saterfiel explained that one reason for the disproportionate number of white children in the district's more advanced achievement groups is the presence in the district of Mississippi State University. He said that, of the 15,000 people who live in the district, over 1,000 have Ph.D.s. He said that the socioeconomic background of the children, rather than their race, determined the distribution of the children in the achievement groups. According to Dr. Saterfiel, schools are like hospitals, which must take patients as they come. When schools have children who are unsuccessful in mastering skills, alternative methods such as tutoring, extending school days or years, and achievement grouping may be used. Achievement grouping, he said, is being used in Mississippi schools that are all black in an attempt to "identify children who are low in reading and low in math and need to be able to catch up." Dr. Saterfiel would not state whether achievement grouping was better or worse than the alternative methodologies he mentioned. However, he told the district court that he "would like to see it be able to be used as one of the things that might work." We cannot fault the district judge

for concluding that the Constitution did not require him to deprive Starkville students, whether black or white, of this possible benefit.

## VIVA

 VIVA is a program for students in grades four through nine who are gifted in the areas of art, creative writing or drama. Students in the VIVA program participate in activities not offered in their classrooms. They perform dramatic presentations, enter art contests, prepare simulations of noteworthy events or places, and write and submit their writings to various publications. The program receives State financing, and is monitored closely by the State Department of Education. It has received national recognition from the National Directory of Talented Programs.

To be chosen for participation in VIVA, the student must be nominated by a teacher, a principal, a peer, a parent or the student himself or herself. The nominee's work is submitted to a panel of judges for an eligibility rating. With the exception of students nominated for their talent in drama, the nominee's name, race and grades are not known to the judges. If the panel of judges decides that a student is eligible, his or her work is presented to a bi-racial Local Survey Committee for review, and, if approved, it is submitted to the State Department of Education Regional Screening Team for final action.

Although participation in VIVA is not divided equally between blacks and whites, the district court held that the program was neither discriminatory nor administered in an unfair manner. We agree.

The judgment of the district court is AFFIRMED.