**Robert Earl QUARLES, et al.,**
**Plaintiffs–Appellants,**
**Cross–Appellees,**

v.

**OXFORD MUNICIPAL SEPARATE**
**SCHOOL DISTRICT, et al.,**
**Defendants–Appellees, Cross–Appellants.**

No. 88–4469.

United States Court of Appeals,
Fifth Circuit.

March 27, 1989.
Rehearing Denied May 17, 1989.

Alvin O. Chambliss, Jr., Leonard McClellan, Oxford, Miss., for plaintiffs-appellants, cross-appellees.

H. Scot Spragins, Sumners, Hickman & Rayburn, Will A. Hickman, Oxford, Miss., for defendants-appellees, cross-appellants.

Before REAVLEY, WILLIAMS and JONES, Circuit Judges.

REAVLEY, Circuit Judge:

Appellants, the class of black parents and students of the Oxford, Mississippi community, appeal from the district court's judgment which dissolved all injunctive orders entered against the Oxford Municipal Separate School District ("Oxford") and dismissed the nineteen year old school desegregation suit. They argue on appeal that the district court erred not only in dissolving the existing injunctive orders, but also in refusing to grant additional injunctive relief. We affirm, but vacate that portion of the judgment dealing with court costs.

## I. Background

This school desegregation case began in July 1969 when appellants complained that schools in Oxford, Mississippi had not desegregated effectively. Oxford's board of trustees took immediate steps to remedy the situation and in January 1970 submitted a desegregation plan to the district court. By order dated January 8, 1970, and with the consent of appellants, the court adopted Oxford's plan in large part, thereby commanding Oxford to "begin immediately to operate a unitary school system." The district court retained jurisdiction to ensure proper implementation of its order and, in addition, required periodic reporting.

In the years since this order was entered, there has been only one issue raised dealing directly with desegregation. In 1972, appellants requested that the district court order Oxford to provide free busing for students. After a fully litigated hearing on the issue, the district court denied appellants' request. In so doing, the court noted that

> [s]tudent activities and functions, administration, staff and all classrooms are and have been since February 1970 fully integrated; one-race schools have been altogether eliminated and are a thing of the past.

\* \* \* \* \* \*

Oxford does not have a history of resistance to court integration orders or for devising assignment plans that promise much but achieve little. On the contrary, as a result of a single order entered by this court, the school district did away with every vestige of the dual school system, and it did so within no more than two weeks' time. The evidence unmistakably shows that Oxford was successful to an astonishing degree in putting an instant end to its de jure dual schools and fully realizing unitary schools.... [A]s conceded by plaintiffs' counsel, there has been from the start a truly unitary system whereby each school enjoys full and effective desegregation.

*Quarles v. Oxford Municipal Separate School Dist.,* 366 F.Supp. 247, 248, 251 (N.D.Miss.1972), *aff'd,* 487 F.2d 824 (5th Cir.1973). Since the busing issue was addressed in 1972, appellants have filed five complaints against the Oxford school system. The complaints have involved, for the most part, school disciplinary matters; only one was pursued and finally adjudicated in appellants' favor.

In 1982, a complaint was filed against Oxford with the Office of Civil Rights ("OCR") for alleged violations of Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d et seq. Following an investigation, the OCR made recommendations in areas in which it felt complaint was justified, which Oxford followed. The OCR has conducted no further investigation.

In June 1987, Oxford filed a motion to modify the 1970 desegregation order. According to the terms of that original order, Oxford was to use four buildings in the instruction of students; each building housed three of Oxford's twelve grades. In its motion, Oxford asserted that, due to increased enrollment and the mandatory addition of a kindergarten grade level, it was necessary to redistribute the students, by grade level, among the existing facilities. Under the proposed plan, Oxford Junior High, which previously had housed students in the seventh through the ninth grades, would be converted to a middle school, that is, it would house students in the sixth through the eighth grades, and the ninth grade would become part of the high school. Appellants, who opposed this aspect of the plan, filed the instant lawsuit seeking supplemental relief or, in the alternative, to have Oxford held in contempt. After a hearing, the court granted Oxford's motion but promised to hear appellants' motion for supplemental relief at a later date.

Because appellants' motion raised many of the issues which a court considers in determining whether a school district has achieved unitary status and thus is entitled to operate free from court supervision, Oxford's school board (its black as well as its white members) decided that this would be an appropriate time to move to dismiss the longstanding desegregation order. Thereafter, the parties engaged in discovery relating to both appellants' and Oxford's motions. The district court held a hearing on these issues on May 2 and 3, 1988, and then issued findings of fact and conclusions of law, holding that Oxford had achieved unitary status and was entitled to a dismissal of the action. The court refused appellants' request for attorney's fees and taxed Oxford with costs. This appeal and cross appeal were then filed.

II. Notice

Because of the potential consequences, we have required district courts to follow certain procedures before declaring a school system unitary. The court must require school boards to submit reports to the court for at least three years. At the end of that period, the court may properly dismiss the action after the plaintiffs are given notice and an opportunity to show cause why continued judicial supervision is necessary. *See United States v. Lawrence County School Dist.,* 799 F.2d 1031, 1037–38 (5th Cir.1986); *Youngblood v. Board of Public Instruction,* 448 F.2d 770, 771 (5th Cir.1971).

Appellants assert that they were not afforded adequate notice and a fair opportunity to litigate the unitary status issue since they believed that the May 2 hearing was being held for the sole purpose of

considering their motion for supplemental relief. It is undisputed that the district court originally refused Oxford's request to combine the motion to vacate the desegregation order with the plaintiffs' motion and that the district court announced its intent to consider the motions together for the first time at the commencement of the hearing on May 2 (1988). However, we cannot conclude that appellants have a legitimate complaint here.

When the district court announced that it would grant Oxford's motion to dismiss the order unless appellants showed either that Oxford had failed to comply with the court's order or that supplemental relief was in order, counsel for appellants neither objected nor moved for a continuance on the ground that he was unprepared to address that issue. In fact, it does not appear that he could have raised such an objection. Appellants themselves arguably put Oxford's unitary status in issue by charging in their complaint that "the Oxford school system [sic] unitary status is being threatened and resegregation is rapidly taking place" and that Oxford's actions "violate[ ] movants' Fourteenth Amendment rights to a unitary system free from discrimination and the rights of all black children in the school system." Appellants' own motion dealt in some way with five of the six factors the Supreme Court has specified for consideration in determining whether a school system has achieved unitary status: faculty; staff; extracurricular activities; facilities; and composition of student body. *See Green v. County School Board of New Kent County*, 391 U.S. 430, 435, 88 S.Ct. 1689, 1693, 20 L.Ed.

2d 716 (1968). The sixth factor, transportation, was not subject to controversy.

 Appellants clearly had adequate time in which to prepare their case opposing Oxford's motion. Appellants filed their motion for supplemental relief in June 1987; Oxford filed its motion to dismiss in September 1987. Comprehensive discovery requests then were propounded by both parties relating to the claims presented in both motions. The hearing was not held until May 1988. Given these circumstances, we hold that appellants had ample notice and opportunity to prepare and litigate the issue of Oxford's unitary status.

### III. Unitary Status

 Appellants contend that the district court erred in concluding that Oxford had achieved unitary status.[1] They maintain that "state-imposed segregation" still exists in four areas of school operation: (1) achievement grouping; (2) discipline; (3) employment; and (4) one-race programs and extracurricular activities. The district court's findings on these issues will not be set aside unless they are clearly erroneous. *See* Fed.R.Civ.P. 52(a); *Castaneda v. Pickard*, 781 F.2d 456, 460 (5th Cir.1986).

#### A. Achievement grouping

Appellants argue that Oxford's grouping system discriminates against black students on the basis of race in violation of the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, and state law.[2]

Achievement or ability grouping has been recognized by both courts and educators as an acceptable and commonly used instruction method. *See Castaneda v.*

---

1. They also assert that, in reaching its decision, the district court erred in refusing to consider evidence relating to the Oxford–Lafayette Business and Industrial Complex ("B & I"), an entity created through the joint efforts of the Oxford and Lafayette County School Districts in order to provide greater vocational technical education. Oxford does not dispute that the B & I was designed to further the education and needs of certain children who also attend Oxford schools, but insists that the court properly refused evidence of the B & I's racial makeup and policies since it is a separate entity governed by a separate board and administration. We agree. Although three of the five Oxford school board

members sit on the B & I board, along with three Lafayette board members, the B & I is a totally separate school. Therefore, since neither the B & I board nor the Lafayette board was joined as a defendant, complete relief could not have been granted to appellants to correct the perceived wrongs of the B & I. The district court correctly refused to admit this evidence.

2. Appellants themselves admit that there is "no [Mississippi] case law on point for ability grouping." Therefore, we do not address this aspect of their claim.

*Pickard,* 648 F.2d 989, 996 (5th Cir.1981); *Morales v. Shannon,* 516 F.2d 411, 413–14 (5th Cir.), *cert. denied,* 423 U.S. 1034, 96 S.Ct. 566, 46 L.Ed.2d 408 (1975). Still, plaintiffs may challenge the school district's assignment practices by demonstrating that such practices have the effect of perpetuating or reestablishing a dual school system. *See McNeal v. Tate County School Dist.,* 508 F.2d 1017, 1019–20 (5th Cir.1975). Once evidence of a significant segregative effect resulting from the use of achievement grouping is introduced, a school system may justify its continued use by demonstrating that its practices (1) are not based on the present results of past discrimination *or* (2) will remedy such present results through better educational opportunities. *Id.*[3]

Oxford's limited form of achievement grouping, which was reviewed, modified and approved by the OCR in 1981–82, is strikingly similar to that which was accepted by the court in *Montgomery v. Starkville Municipal Separate School Dist.,* 665 F.Supp. 487, 495–502 (N.D.Miss.1987), *aff'd,* 854 F.2d 127 (5th Cir.1988). Basically, only students in the third through the eighth grades are grouped in the traditional sense. Beginning in the third grade, students are placed in groups (high, middle, low) for instruction in language arts and mathematics based on Stanford Achievement Test ("SAT") scores in those respective areas. Thus, a student's placement in mathematics is unrelated to his or her placement in language arts. With the exception of language arts and mathematics, students in grades three through eight are grouped heterogenously in classrooms where gender and race are balanced.

■ At the high school level there is no achievement grouping per se. There are,

however, advanced placement, or accelerated, courses offered, most of which are racially identifiable as white. Appellants insist that these classes are predominantly white as a result of racial discrimination. Based on the evidence, we disagree. At the hearing, the high school's guidance director testified that, although the state department of education has a cut-off for entrance into the accelerated program, Oxford does not impose that requirement. Therefore, all classes, including the accelerated classes, truly are open to all students. Under these circumstances, the fact that more white students than black students are enrolled in the accelerated classes cannot be attributed to racial discrimination.

It is undisputed that, in those grades in which grouping does occur, there is a high concentration of white students in the upper level groups and of black students in the lower level groups. However, the evidence Oxford presented on this issue led the district court to conclude that "neither the present grouping system nor the present disparate impact, however minimal that might be, is causally related to the former segregated system." Dr. Thomas Saterfiel, Deputy Superintendent of Education for the State of Mississippi, and Dr. Thomas Payne, Dean of the School of Education at the University of Mississippi, both testified that the achievement grouping system Oxford employs is educationally sound, both in theory and in practice. Oxford's students, both black and white, consistently rank among the highest in the state in terms of composite scores on the American College Test ("ACT") and the Basic Skills Assessment Program ("BSAP").

Further, expert testimony established that Oxford's students are not locked into

---

**3.** The applicable standards under Title VI are substantially similar to those outlined above. *See Georgia State Conference of Branches of NAACP v. Georgia,* 775 F.2d 1403, 1417 (11th Cir.1985). To make out a disparate impact claim under Title VI, the plaintiff first must show by a preponderance of the evidence that a facially neutral practice has a racially disproportionate effect; the burden then shifts to the defendant to provide a substantial legitimate justification for its practice. The plaintiff may

ultimately prevail by proffering an equally effective alternative practice which results in less racial disproportionality or proof that the legitimate practices are a pretext for discrimination. *See generally McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Because the same rationale underlies our conclusion that appellants failed to meet their burden under both the Fourteenth Amendment and Title VI, we do not discuss them separately.

place, or tracked, in the grouping system. Oxford's achievement grouping plan provides several opportunities for movement among achievement levels during the school year. Students may be moved on the basis of their scores on the SAT, which is given once a year. In addition, however, in recognition of the fact that all students do not perform as test scores predict, a student may be moved into another level after the initial placement if the child's teachers agree that it is in the best interest of the child and if exceptional progress or lack of progress indicates that movement may be proper. For the same reason, the policy provides that a parent may make written request for a student transfer into a higher level after conferring with the student's teacher and principal.[4] This system appears to be working. After considering all of the evidence, the district court determined that there is an "impressive" degree of movement among achievement levels by black students as well as by white students.

■ Appellants contend, however, that better student assignment methods exist which involve less segregative impact. They offered the testimony of Dr. Jeanne Oakes, who testified that alternative methods of instruction exist which might produce better results and at the same time reduce the segregative impact. The district court discounted Dr. Oakes' testimony, as it was entitled to do, since "she had never visited the Oxford school system and had no knowledge of the way in which it functioned within the district." In fact, Dr. Oakes stated that she could not offer an opinion as to the achievement grouping practices of the Oxford school district because she did not have all of the necessary evidence upon which to base an opinion. Also, there was testimony from Oxford's expert, Dr. Thomas Payne, that the alternative methods advocated by Dr. Oakes were still in the experimental stages.

Educators have long debated the advantages and disadvantages of placing students in classrooms with others perceived to have similar abilities; "nevertheless, it is educators, rather than courts, who are in a better position ultimately to resolve the question whether such a practice is, on the whole, more beneficial than detrimental to the students involved." *Castaneda,* 648 F.2d at 996. The district court, after careful study, determined that Oxford's achievement grouping system "is neither intended nor does it have the effect of having significant racial impact upon the makeup of the classrooms in the various schools of the system." Based on the record before us, we cannot conclude that these findings are clearly erroneous.

B. Discipline

Appellants allege that black students in Oxford consistently have been mistreated and disciplined in a discriminatory fashion. In their brief, they cite statistics and isolated instances of alleged disparate treatment, some of which are not borne out by the record evidence. Oxford's evidence on this issue consisted, in part, of the testimony of Dr. Bob McCord, the school superintendent, to the effect that school board policy requires each school's administrative staff to adopt and publish race-neutral, uniform rules and regulations to govern the administration of discipline.[5] He also testified that in the last three years he has not received a single complaint regarding student discipline that was based on race. Another defense witness, Dr. Saterfiel, testified that, based on appellants' exhibits regarding discipline, he could find no significant difference in the way black students and white students were disciplined.

■ Appellants cite *Tasby v. Estes,* 643 F.2d 1103 (5th Cir.1981), for the proposition that statistical disparity between the frequency and severity of punishment accorded black and white students, plus direct evidence of abuse, is actionable. That, of

---

4. Appellants suggest that this feature destroys the benefits of grouping, yet they provided no proof to suggest that parental input had any bearing on the racial makeup of classrooms.

5. Appellants do not argue that the rules themselves are discriminatory.

course, is true. However, the court in *Tasby* went on to say that plaintiffs who present this sort of evidence must also account for the "many variables at work in the process of disciplining school children." *Id.* at 1108. Appellants have provided no such proof. Therefore, even if we were to accept appellants' allegations as true, we could not conclude that the district court erred in finding that race "plays no part in administering discipline in the Oxford School System."

## C. Employment

■ Appellants maintain that Oxford has not disestablished its discriminatory employment practices. Specifically they complain that the number of black teachers is disproportionate to the black student enrollment, that white teachers consistently are given better teaching assignments than their black counterparts, and that Oxford purposefully has refused to hire qualified black applicants.

As an initial matter, we note that students do not have "a constitutional right to attend a school with a teaching staff of any particular racial composition." *Oliver v. Kalamazoo Bd. of Education,* 706 F.2d 757, 762 (6th Cir.1983) (citing *Fort Bend Independent School Dist. v. City of Stafford,* 651 F.2d 1133 (5th Cir.1981)). Likewise, there is no requirement that a school district maintain the same absolute number of minority employees it had before desegregation. *Fort Bend,* 651 F.2d at 1140. When the Oxford school system was desegregated in 1970, faculty and staff were distributed among the various schools and classrooms so that no one school was racially identifiable. Thereafter, the system functioned "from the standpoint of faculty and staff on the merit system." *Carter v. West Feliciana Parish School Bd.,* 432 F.2d 875, 878 (5th Cir.1970).

Appellants insist, however, that the numbers of black teachers have declined over the years due to racial discrimination. To the contrary, the evidence showed that the percentage of black teachers increased over the period in question. In 1980–81, Oxford employed forty-two blacks and one-hundred fifteen whites; in 1986–87, Oxford employed forty-three blacks and ninety-four whites. From this evidence it is obvious that any decrease has been in the numbers of white teachers.

Nor are we persuaded by appellants' contention that blacks have been treated discriminatorily in the work pattern. At the hearing, appellants presented the testimony of five present and former employees of the Oxford school district. Most testified that they had applied unsuccessfully for what they perceived were better positions within the system, yet none presented evidence tending to show that the employment decisions affecting them were racially motivated. The evidence presented by Oxford, both through the direct testimony of the school superintendent and through the testimony of appellants' witnesses elicited on cross-examination, showed that, contrary to appellants' assertions, employment decisions were not based on race. For example, one teacher testified that despite her attempts to be assigned to high level courses, she repeatedly was relegated to teaching low level classes. On cross-examination, however, she admitted that teaching assignments were the responsibility of the building principal and that for the majority of her tenure, her building principal had been black. Also, the evidence established that two of the teachers who testified on behalf of appellants were passed over for positions they desired due to either lack of experience or lack of educational qualification.

Legitimate reasons for the decisions were articulated which appellants did not rebut. Moreover, the statistics demonstrated that Oxford has not discriminated in its treatment of black teachers and administrators. Dr. McCord testified that there had been no demotions of black teachers in the last three years and that within that same timeframe, seven black persons had been promoted as compared to only three white persons.

Appellants maintain that the district court erred in concluding that Oxford has "engaged in genuine efforts toward increasing, or at least preventing an erosion

of, the proportion of black employees employed by the school district." They claim that, instead, Oxford has turned away many qualified black teachers and administrators. The evidence presented did not support this claim. Dr. Saterfiel, who is in charge of teacher certification in Mississippi, testified that in 1980–81, 17% of the "new teacher pool" was black. By 1986–87, that figure had dropped to 10%. Over that same period of time, the percentage of black teachers in Oxford increased. In their brief appellants assert that "numerous black teachers have applied for positions in the school system" without success. At the hearing, however, appellants produced testimony from only two such individuals. Appellants ask that we infer from this evidence that the reason they were not hired was on the basis of their race. Without more, we cannot conclude that Oxford's failure to hire these two individuals reflects a policy of racial discrimination on the part of the school system. The evidence presented to the district court amply supports its finding that race is not a factor in employment decisions in Oxford.

### D. One-race activities

Finally, appellants allege that Oxford maintains and endorses numerous one-race activities in the schools. Indeed, the evidence presented at the hearing indicated that far more white children than black children participate in extracurricular activities; as a result, many school activities and programs are racially identifiable. From this evidence, appellants urge us to conclude that black students are denied equal access to these activities.

In *Bazemore v. Friday,* 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986), the Supreme Court addressed a similar situation. The plaintiffs in *Bazemore* claimed that the University of North Carolina Extension Service racially discriminated in the operation of certain clubs. The proof presented showed that, despite the Service's implementation of nondiscriminatory policies and its efforts to encourage integrated participation in the clubs, many continued to be one race. Focusing on the Service's policies against discrimination and the voluntariness of the activities, the district court determined that the plaintiffs had shown no evidence of discrimination. The court of appeals and the Supreme Court affirmed. *Id.* at 408, 106 S.Ct. at 3013.

Similarly, in this case, participation in most extracurricular activities sponsored by Oxford schools is entirely voluntary. The Oxford school board expressly requires each school principal to ensure that any club or extracurricular activity be open to all students regardless of race. Also, the administration encourages teachers of both races to serve as activity sponsors. Those teachers are then entrusted with enforcing the school district's nondiscrimination policy. Appellants have failed to produce evidence to suggest that racial identifiability in these wholly voluntary extracurricular activities is the result of anything other than what the district court termed as "the voluntary and unfettered choice of the Oxford School students."

At least two activities, however, cannot be characterized as purely voluntary in nature since they involve an audition and selection process; appellants assert that Oxford has discriminatory policies regarding them both—cheerleading and school musical productions. Based on the evidence presented, we cannot agree. At the hearing, Oxford introduced into evidence specific, detailed policies that have been promulgated in an effort to encourage interracial participation in these activities and to inspire confidence in the community that Oxford is working to ensure that all students will be treated equally. In addition, though, appellants failed to produce evidence to suggest that black students had auditioned for and been denied places on the cheerleading squad or in the school musicals.[6] The district court determined

6. Appellants did present the testimony of James Mosley, a high school student who claimed he was denied the part of his choice in the production "Seven Brides for Seven Brothers" as a result of racial discrimination. We note that this incident was the subject of a separate lawsuit filed in Chief Judge L. T. Senter's court. Judge Senter dismissed the action on the basis

that there was "no evidence to support [t]he claim that the school system has a custom or practice of discriminating against blacks in extracurricular activities." This finding was not clearly erroneous.

## IV. Attorney's Fees

■ Appellants contend that the district court abused its discretion in refusing their post-trial request for attorney's fees. As a general rule, only a party who prevails on the merits may recover attorney's fees. *See Frazier v. Board of Trustees*, 765 F.2d 1278, 1292 (5th Cir.1985), *cert. denied*, 476 U.S. 1142, 106 S.Ct. 2252, 90 L.Ed.2d 697 (1986). In addressing appellants' motion, the district court recognized that appellants had been the "prevailing party" on one occasion. On December 8, 1987, the court dismissed Oxford's motion for sanctions against appellants' attorney. However, Uniform Local Rule 15 provides that a prevailing party is obligated to move for an award of attorney's fees within thirty days after the entry of judgment in its favor. Because appellants did not file a motion for fees within thirty days of December 8, the district court determined that their later motion was untimely. We agree. In any event, we are not persuaded that appellants have shown a statutory entitlement to attorney's fees since this particular claim related to a matter entirely collateral to the issues raised in the main litigation.

■ Appellants also argue that they are entitled to recover attorney's fees incurred over the nineteen year period during which this case has been pending. This argument is foreclosed by *Henry v. Clarksdale Municipal Separate School Dist.*, 579 F.2d 916 (5th Cir.1978). In that desegregation case, this court considered whether a supplemental motion, filed many months after all other issues had been decided, necessarily reopens the entire litigation for the purpose of allowing attorney's fees. The court concluded that it does not and then wrote that "[s]ince most school cases involve relief of an injunctive nature, district courts will maintain jurisdiction long after determining the issues in controversy. The ultimate approach to finality must be an individual and pragmatic one. Such a matter should be committed to the determination of the trial court.'" *Id.* at 919 (quoting *Johnson v. Combs*, 471 F.2d 84, 87 (5th Cir.1972), *cert. denied*, 413 U.S. 922, 93 S.Ct. 3063, 37 L.Ed.2d 1044 (1973)). The district court did not abuse its discretion in denying appellants' motion for attorney's fees.

## V. Court Costs

■ On cross-appeal, Oxford asserts that the district court abused its discretion in awarding appellants court costs. Fed.R. Civ.P. 54(d) provides that as a general rule "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." In *Three–Seventy Leasing Corp. v. Ampex Corp.*, 528 F.2d 993 (5th Cir. 1976), the district court awarded costs to the nonprevailing party. This court found that that was error and remanded for reconsideration on that issue: "Rule 54(d) does not give the district court the power to award costs to the nonprevailing party, but gives that court discretion to order that each party bear part or all of its own costs." *Id.* at 999. Given this state of the law, ordinarily we would vacate that part of the judgment awarding appellants' costs and remand to the district court for reconsideration of this issue. However, in this case, we note that appellants failed to file with the district court their "bill of costs" within thirty days of entry of judgment as required by Uniform Local Rule 15(a). Therefore, we simply vacate that part of the district court's order which imposes costs upon Oxford. Each party will bear its own costs. With this minor exception, the judgment of the district court is affirmed.

AFFIRMED IN PART; VACATED IN PART.

---

that Mosley had failed to demonstrate that the teacher he sued was in any way responsible for casting decisions. We affirmed. Mosley's testimony in the instant suit was identical to that in the separate action. Even if we were to accept his claim as true, however, we could not conclude that this one incident established a system-wide practice of discrimination.