86 N.Y.2d 307 (1995)
655 N.E.2d 661
631 N.Y.S.2d 565
Campaign for Fiscal Equity, Inc., et al., Appellants,
v.
State of New York et al., Respondents.
Court of Appeals of the State of New York.
Argued February 16, 1995.
Decided June 15, 1995.
Michael A. Rebell Associates, New York City (Michael A. Rebell and Robert L. Hughes of counsel), and Teitelbaum, Hiller, Rodman, Paden & Hibsher, P. C., for appellants.
Dennis C. Vacco, Attorney-General, New York City (Mark G. Peters, Victoria A. Graffeo, Andrea Green, Harvey J. Golubock, Jeffrey I. Slonim and Clement J. Colucci of counsel), for respondents.
Donald Shaffer, New York City, Helen Herskhoff, Arthur Eisenberg and Beth Haroules for American Civil Liberties Union Foundation and others, amici curiae.
DeGraff, Foy, Holt-Harris, Mealey & Kunz, Albany (Robert E. Biggerstaff and Glen P. Doherty of counsel), for New York State Association of Small City School Districts, Inc., amicus curiae.
Majority opinion by Judge CIPARICK and Judges SIMONS, TITONE, BELLACOSA, SMITH and LEVINE concur; Judge LEVINE concurring in result as to the first cause of action based upon a violation of New York Constitution, article XI, § 1, the Education Article, in a separate opinion; Judge SIMONS dissenting in part and voting not to reinstate the first cause of action in a separate opinion; Judge SMITH dissenting in part and voting to reinstate causes of action on behalf of the municipal plaintiffs as well as the nonmunicipal plaintiffs and to reinstate the second cause of action in its entirety, alleging violations of the Equal Protection Clauses of the Federal and State Constitutions in a separate opinion; and Judge CIPARICK dissenting in part and voting to reinstate causes of action on behalf of the municipal plaintiffs as well as the nonmunicipal plaintiffs and to reinstate the second cause of action insofar as it asserts a violation of the Equal Protection Clause of the State Constitution, for reasons stated in Judge SMITH'S dissenting-in-part opinion; Chief Judge KAYE taking no part.
*312 CIPARICK, J.
Thirteen years after we decided Board of Educ., Levittown Union Free School Dist. v Nyquist (57 N.Y.2d 27) (hereinafter Levittown), we are again faced with a challenge to the constitutionality of New York State's public school financing system. We are called upon to decide whether plaintiffs' (Campaign for Fiscal Equity et al.) complaint pleads viable causes of action under the Education Article of the State Constitution, the Equal Protection Clauses of the State and Federal Constitutions, and title VI of the Civil Rights Act of 1964 and its implementing regulations.
Judges Titone, Bellacosa, Smith and I conclude that the nonschool board plaintiffs plead a sustainable claim under the Education Article.[1] Judge Levine concurs in a separate opinion. The Court is unanimous that, as to the nonschool board plaintiffs, a valid cause of action has been pleaded under title VI's implementing regulations. The remainder of this complaint should be dismissed.

I.
Plaintiffs in this case are (1) Campaign for Fiscal Equity, Inc. (CFE), a not-for-profit corporation whose membership consists of community school boards, individual citizens, and a number of parent advocacy organizations; (2) 14 of New York City's 32 school districts; and (3) individual students who attend New York City public schools and their parents. The defendants are New York State, the Governor, the Commissioner of Education, the Commissioner of Taxation and Finance, and the Majority and Minority Leaders of the Senate and Assembly.
Plaintiffs commenced this action seeking a declaratory judgment against the State defendants, claiming that the State's *313 public school financing system is unconstitutional under the Education Article of the State Constitution (art XI, § 1), the Equal Protection Clauses of the State (art I, § 11) and Federal Constitutions (US Const 14th Amend), the Antidiscrimination Clause of the State Constitution (art I, § 11),[2] and is unlawful under title VI of the Civil Rights Act of 1964 (42 USC § 2000d et seq.) and the United States Department of Education's regulations implementing title VI (34 CFR 100.3 [b] [2]).
Three defendants  the State of New York, the Senate Majority Leader, and the Assembly Minority Leader  brought the instant motion to dismiss under CPLR 3211 (a) (3) and (7), contending "that certain plaintiffs lack the right to bring this action and that the complaint fails to state a cause of action."
Supreme Court granted defendants' motion to the extent of dismissing all claims asserted on behalf of the plaintiff school districts on the ground that they lacked the legal capacity to sue.[3] As to the remaining plaintiffs  CFE and the individual students and parents  the court dismissed their equal protection and title VI claims for failure to state a cause of action, but ruled that the complaint stated valid claims under the Education Article, the Antidiscrimination Clause of the State Constitution, and title VI's implementing regulations.
The Appellate Division modified the order of Supreme Court by fully granting defendants' motion to dismiss and dismissing the claims made under the Education Article, the Antidiscrimination Clause, and the title VI regulations for failure to state causes of action. The Appellate Division concluded that plaintiffs' allegations that reduced resources have resulted in the failure to provide New York City school children with an opportunity to receive a minimally adequate education were conclusory in nature, and, in any event, embodied a theory "virtually identical to that advanced, fully tried and ultimately rejected on appeal in Levittown." (205 AD2d 272, 276.) The Court also concluded that the prohibition in title VI's regulations against methods of administration which have an unlawful impact on racial and ethnic minorities was not violated by the State's role in allocating a lump sum of education aid to the New York City school system.

*314 II.  Education Article
The first cause of action in plaintiffs' complaint essentially alleges that the State's educational financing scheme fails to provide public school students in the City of New York, including the individual plaintiffs herein, an opportunity to obtain a sound basic education as required by the State Constitution.
Discussion of the constitutional issues raised in this case necessarily takes place against the backdrop of our decision in Levittown (57 N.Y.2d 27, supra). The Levittown plaintiffs consisted of 27 property-poor school districts, boards of education of 4 of the State's 5 largest cities (including New York City), and a number of school children and their parents residing in the property-poor school districts. After a 122-day trial, Supreme Court issued a judgment declaring that the 1974 school financing system violated the Equal Protection Clauses of the Federal and State Constitutions and the Education Article of the State Constitution. The Appellate Division agreed, except as to the Federal equal protection claim. This Court modified, by substituting a declaration "that the present statutory provisions for allocation of State aid to local school districts for the maintenance and support of elementary and secondary public education are not violative of either Federal or State Constitution." (Id., at 50.)
We rejected the Levittown plaintiffs' Federal equal protection challenge based on the decision of the Supreme Court of the United States in San Antonio School Dist. v Rodriguez (411 US 1) (id., at 41). The State equal protection challenge was rejected after we applied the rational basis test (id., at 43-46). Finally, the Education Article challenge was found lacking, as the plaintiffs advanced no claim of a deprivation of "minimal acceptable facilities and services" or "a sound basic education" (id., at 47, 48).
Article XI, § 1 of the State Constitution, the Education Article, mandates that "[t]he legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated." In Levittown, this Court examined the Education Article's language and history and rejected the plaintiffs' contention that the provision was intended to ensure equality of educational offerings throughout the State (57 N.Y.2d 17, 47, supra). Rather, we stated, "[w]hat appears to have been contemplated when the Education Article was adopted at the 1894 Constitutional *315 Convention was a State-wide system assuring minimal acceptable facilities and services in contrast to the unsystematized delivery of instruction then in existence within the State." (Id. [emphasis added].) In order to satisfy the Education Article's mandate, the system in place must at least make available an "education", a term we interpreted to connote "a sound basic education" (id., at 48).
The Court in Levittown acknowledged the existence of "significant inequalities in the availability of financial support for local school districts, ranging from minor discrepancies to major differences, resulting in significant unevenness in the educational opportunities offered." (Id., at 38.) Nonetheless such unevenness of educational opportunity did not render the school financing system constitutionally infirm, unless it could be shown that the system's funding inequities resulted in the deprivation of a sound basic education (id., at 47-48).
The gravamen of the plaintiffs' complaint in Levittown was that "property-rich districts have an ability to raise greater local tax revenue enabling them to provide enriched educational programs beyond the fiscal ability of the property-poor districts." (57 NY2d, at 36.) Indeed, we specifically noted:
"No claim is advanced in this case, however, by * * * plaintiffs * * * that the educational facilities or services provided in the school districts that they represent fall below the State-wide minimum standard of educational quality and quantity fixed by the Board of Regents; their attack is directed at the existing disparities in financial resources which lead to educational unevenness above that minimum standard." (Id., at 38.)
We recognized in Levittown that the Education Article imposes a duty on the Legislature to ensure the availability of a sound basic education to all the children of the State. Contrary to the dissenting expression of Judge Simons, we are unable to adopt the view that the constitutional language at issue is, in effect, hortatory. Indeed, we should not do so in the face of Levittown's unambiguous acknowledgment of a constitutional floor with respect to educational adequacy. We conclude that a duty exists and that we are responsible for adjudicating the nature of that duty.
In this case, the principal premise underlying the Appellate Division's dismissal of plaintiffs' Education Article cause of action  that it is "virtually identical" to the theory tried and *316 rejected in Levittown  is flawed and fails. Plaintiffs advance the very claim we specifically stated was not before us in Levittown, i.e., that minimally acceptable educational services and facilities are not being provided in plaintiffs' school districts. Levittown does not foreclose plaintiffs' Education Article claim. Rather, a fair, contextual reading of that case compels the contrary conclusion. The Court there manifestly left room for a conclusion that a system which failed to provide for a sound basic education would violate the Education Article (id., at 48).
Having concluded that Levittown is not an obstacle to plaintiffs' Education Article claim, we turn next to the crucial question: whether plaintiffs have properly stated a cause of action under the Education Article.
That Article requires the State to offer all children the opportunity of a sound basic education (id.).[4] Such an education should consist of the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury. If the physical facilities and pedagogical services and resources made available under the present system are adequate to provide children with the opportunity to obtain these essential skills, the State will have satisfied its constitutional obligation. As we stated in Levittown,
"The Legislature has made prescriptions (or in some instances provided means by which prescriptions may be made) with reference to the minimum number of days of school attendance, required courses, textbooks, qualifications of teachers and of certain nonteaching personnel, pupil transportation, and other matters. If what is made available by this system (which is what is to be maintained and supported) may properly be said to constitute an education, the constitutional mandate is satisfied." (57 NY2d, at 48.)
*317 The State must assure that some essentials are provided. Children are entitled to minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit children to learn. Children should have access to minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks. Children are also entitled to minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies, by sufficient personnel adequately trained to teach those subject areas.
We note that plaintiffs, throughout their complaint, rely on the minimum State-wide educational standards established by the Board of Regents and the Commissioner of Education, a reliance directly traceable to certain language in Levittown (see, 57 NY2d, at 38). Contrary to Judge Simons, we see no reason to penalize plaintiffs for referencing those standards in this manner. Construing the allegations liberally and in whole, as we must (see, Leon v Martinez, 84 N.Y.2d 83, 87-88), there can be no question that the pertinent pivotal claim made here is that the present financing system is not providing City school children with an opportunity to obtain a sound basic education. However, because many of the Regents' and Commissioner's standards exceed notions of a minimally adequate or sound basic education  some are also aspirational  prudence should govern utilization of the Regents' standards as benchmarks of educational adequacy. Proof of noncompliance with one or more of the Regents' or Commissioner's standards may not, standing alone, establish a violation of the Education Article.
Plaintiffs also rely on standardized competency examinations established by the Regents and the Commissioner to measure minimum educational skills (see, 8 NYCRR 100.3 [b] [2]; 100.5 [a] [4]). Performance levels on such examinations are helpful but should also be used cautiously as there are a myriad of factors which have a causal bearing on test results.
We do not attempt to definitively specify what the constitutional concept and mandate of a sound basic education entails. Given the procedural posture of this case, an exhaustive discussion and consideration of the meaning of a "sound basic education" is premature. Only after discovery and the development of a factual record can this issue be fully evaluated and resolved. Rather, we articulate a template reflecting our judgment of what the trier of fact must consider in determining *318 whether defendants have met their constitutional obligation. The trial court will have to evaluate whether the children in plaintiffs' districts are in fact being provided the opportunity to acquire the basic literacy, calculating and verbal skills necessary to enable them to function as civic participants capable of voting and serving as jurors.
A relevant issue at this point is whether plaintiffs can establish a correlation between funding and educational opportunity. In order to succeed in the specific context of this case, plaintiffs will have to establish a causal link between the present funding system and any proven failure to provide a sound basic education to New York City school children. However, we believe that Judge Simons' extended causation discussion (see, dissenting in part opn, at 339-340) is premature given the procedural context of this case.
We turn next more specifically to the complaint. In considering the sufficiency of a pleading subject to a motion to dismiss for failure to state a cause of action under CPLR 3211 (a) (7), our well-settled task is to determine whether, "accepting as true the factual averments of the complaint, plaintiff can succeed upon any reasonable view of the facts stated" (People v New York City Tr. Auth., 59 N.Y.2d 343, 348; see, Jiggetts v Grinker, 75 N.Y.2d 411, 414-415; 219 Broadway Corp. v Alexander's, Inc., 46 N.Y.2d 506, 509). We are required to accord plaintiffs the benefit of all favorable inferences which may be drawn from their pleading, without expressing our opinion as to whether they can ultimately establish the truth of their allegations before the trier of fact (see, 219 Broadway, supra, at 509; Underpinning & Found. Constructors v Chase Manhattan Bank, 46 N.Y.2d 459; Morone v Morone, 50 N.Y.2d 481). Only recently we recognized the right of plaintiffs "to seek redress, and not have the courthouse doors closed at the very inception of an action, where the pleading meets a minimal standard necessary to resist dismissal of a complaint." (Armstrong v Simon & Schuster, 85 N.Y.2d 373, 379; see also, Leon v Martinez, 84 N.Y.2d 83, 87-88, supra [court is to "determine only whether the facts as alleged fit within any cognizable legal theory"].) If we determine that plaintiffs are entitled to relief on any reasonable view of the facts stated, our inquiry is complete and we must declare the complaint legally sufficient (see, 219 Broadway, supra).
According to plaintiffs, New York City students are not receiving the opportunity to obtain an education that enables *319 them to speak, listen, read, and write clearly and effectively in English, perform basic mathematical calculations, be knowledgeable about political, economic and social institutions and procedures in this country and abroad, or to acquire the skills, knowledge, understanding and attitudes necessary to participate in democratic self-government (plaintiffs' amended complaint, record on appeal, at 64-65).
Plaintiffs support these allegations with fact-based claims of inadequacies in physical facilities, curricula, numbers of qualified teachers, availability of textbooks, library books, etc. On the basis of these factual allegations, and the inferences to be drawn therefrom, we discern a properly stated cause of action sufficient to survive a motion to dismiss and to permit this portion of the action to go forward. Taking as true the allegations in the complaint, as we must, plaintiffs allege and specify gross educational inadequacies that, if proven, could support a conclusion that the State's public school financing system effectively fails to provide for a minimally adequate educational opportunity. We think it beyond cavil that the failure to provide the opportunity to obtain such fundamental skills as literacy and the ability to add, subtract and divide numbers would constitute a violation of the Education Article. In our view, plaintiffs have alleged facts which fit within a cognizable legal theory (see, Leon v Martinez, 84 N.Y.2d 83, 87-88, supra). Accordingly, plaintiffs' cause of action under the Education Article should be reinstated.

III.  Equal Protection
Judges Simons, Titone, Bellacosa and Levine conclude that the second cause of action alleging that the State's school financing scheme violates the Equal Protection Clauses of the Federal and State Constitutions (US Const 14th Amend; NY Const, art I, § 11) must be dismissed in light of our decision in Levittown.[5]
In Levittown, we followed San Antonio School Dist. v Rodriguez (411 US 1, reh denied 411 US 959, supra) in holding that education was not a fundamental right under the United States Constitution, and concluded as well that it was not a fundamental right under the State Constitution (57 NY2d, at 41-43). *320 Therefore, we held, the rational basis test was the appropriate standard for equal protection analysis under both Constitutions (id.). We concluded in Levittown that any disparities in educational funding among school districts in the State arising from the State's financing scheme were rationally based upon and reasonably related to a legitimate State interest, "the preservation and promotion of local control of education" (id., at 44).
Plaintiffs attempt to distinguish Levittown in two ways. First, plaintiffs contend that absent from the pleadings and proof in the Levittown case was the claim they make here, that the State's funding methodology deprives New York City school children of a "minimum adequate education."[6] Relying on Plyler v Doe (457 US 202, reh denied 458 US 1131), they urge that an intermediate level of scrutiny applies to such a deprivation, thereby shifting the burden to the State to show a substantial relationship of its educational funding scheme to a substantial State interest (see, id., at 224 [Brennan, J.]; see also, id., at 239 [Powell, J., concurring]). This Court today finds this argument unpersuasive for the following reasons.
First, Plyler v Doe does not stand for the broad proposition that heightened scrutiny applies in all State financing challenges, merely when, as here, the gravamen of the plaintiffs' factual allegations charges violations of the "state-wide minimum standard of educational quality and quantity."[7] (Emphasis supplied.) Plyler explicitly disclaimed elevating public education to a "`right' granted to individuals by the Constitution" (id., at 221; see also, id., at 223). The Court discerns important differences between the instant case and Plyler, i.e., the educational deprivation was absolute in Plyler and was intentionally discriminatory toward a defined subclass, the blameless children of undocumented alien adults. Moreover, the reach of Plyler's holding was specifically clarified in Kadrmas v Dickinson Pub. Schools (487 US 450), where the Supreme Court explained:
"We have not extended [Plyler's application of a heightened level of equal protection scrutiny] beyond the `unique circumstances', [Plyler v Doe, 457 US, at 239] (Powell, J., concurring), that provoked its `unique confluence of theories and rationales'" (487 US, at 459).
*321 Thus, as to the claimed violation of the Equal Protection Clause of the Federal Constitution, the Court determines that neither Plyler nor any Supreme Court case decided after Levittown requires reexamination of our holding in that case rejecting heightened scrutiny and finding a rational basis in the State's educational funding scheme.
Alternatively, plaintiffs' claim that heightened scrutiny is required under the Equal Protection Clause of the State Constitution because, unlike the Levittown plaintiffs, in this case they have alleged that the State's educational funding methodology has a disparate impact upon African-American and other minority students. The Court rejects this contention, noting plaintiffs' concession that no discriminatory intent has been charged in this case.[8] The Court relies on the case law from our Court and the Supreme Court holding that an equal protection cause of action based upon a disproportionate impact upon a suspect class requires establishment of intentional discrimination (see, Arlington Hgts. v Metropolitan Hous. Corp., 429 US 252, 264-265; Washington v Davis, 426 US 229, 240; People v New York City Tr. Auth., 59 N.Y.2d 343, 350, supra; Board of Educ. v Nyquist, 57 NY2d, at 43-44, supra).

IV.  Title VI
Plaintiffs also complain that the State public education financing system violates title VI and title VI's implementing regulations. Title VI provides:
"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance" (42 USC § 2000d).
Title VI prohibits discrimination on the basis of race or national origin in programs receiving Federal financial assistance (see, 42 USC §§ 2000d  2000d-6). The Supreme Court has ruled that there must be a showing of intentional discrimination to succeed on a title VI claim (see, Guardians Assn. v Civil Serv. Commn., 463 US 582). Guardians involved a challenge to the hiring and firing practices of New York City's police department. The principal issue was whether compensation *322 could be awarded for a violation of title VI in the absence of proof of discriminatory intent. Although the Court was divided and no majority opinion issued, seven Justices concluded that proof of discriminatory intent is required in order to make out a violation of title VI (see, Alexander v Choate, 469 US 287, 293). The instant complaint contains no showing of intentional discrimination.
Plaintiffs also allege a violation of title VI's implementing regulations (see, 34 CFR 100.3 [b] [2]), which provide that recipients of Federal funding may not:
"utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin." (Emphasis supplied.)
The regulations incorporate a disparate impact standard.
Under title VI's implementing regulations, proof of discriminatory intent is not a prerequisite to a private cause of action against governmental recipients of Federal funds (see, Choate, supra, at 293-294). Proof of discriminatory effect suffices to establish liability under the regulations promulgated pursuant to title VI: "actions having an unjustifiable disparate impact on minorities [can] be redressed through agency regulations designed to implement the purposes of Title VI" (id., at 293).
Federal courts have consistently held that the evidentiary standards developed under title VII govern title VI cases as well (see, e.g., Georgia State Conference of Branches of NAACP v State of Georgia, 775 F.2d 1403, 1417; Groves v Alabama State Bd. of Educ., 776 F Supp 1518, 1523). Consequently, in order to make out a prima facie case of disparate impact:
"The plaintiff first must show by a preponderance of the evidence that a facially neutral practice has a racially disproportionate effect, whereupon the burden shifts to the defendant to prove a substantial legitimate justification for its practice. The plaintiff then may ultimately prevail by proffering an equally effective alternative practice which results in less racial disproportionality or proof that the legitimate practices are a pretext for *323 discrimination." (Georgia State Conference, supra, at 1417 [citations omitted].)
A validly stated cause of action under the title VI regulations thus has two components: "whether a challenged practice has a sufficiently adverse racial impact  in other words, whether it falls significantly more harshly on a minority racial group than on the majority  and, if so, whether the practice is nevertheless adequately justified." (Groves, supra, at 1523; see, Georgia State Conference, supra, at 1417; Quarles v Oxford Mun. Separate School Dist., 868 F.2d 750, 754, n 3.) Statistics comparing benefit distribution or access patterns among members of the protected class and the over-all population play a key role in demonstrating an adverse racial impact (see, Georgia State Conference, 775 F2d, at 1417 [plaintiffs made prima facie case through statistics showing that the racial composition differed from what would be expected from a random distribution]; Huntington Branch, NAACP v Town of Huntington, 844 F.2d 926, 938; Sharif v New York State Educ. Dept., 709 F Supp 345, 362).
Once a prima facie case is established, the burden of persuasion shifts to the defendant to affirmatively defend the challenged practice by way of a legitimate nondiscriminatory reason (see, Larry P. v Riles, 793 F.2d 969, 982-983). If the defendant meets its burden and demonstrates that the challenged practice is justified or necessary, the plaintiff can still prevail by showing that "less discriminatory alternatives" were available to further the purportedly legitimate interest (see, Abermarle Paper Co. v Moody, 422 US 405, 425).
Applying the foregoing standards to this case, we conclude that plaintiffs have stated a cause of action under title VI's regulations. The Appellate Division dismissed plaintiffs' claim on the ground that the State's role in allocating a lump sum to the New York City school system is not the "function which results in the disparate impact on minority racial or ethnic groups; rather, it is the method by which plaintiff Chancellor of the City School District divides and suballocates those funds that may arguably result in the disparate impact complained of here." (205 AD2d, at 277.) The Appellate Division misconstrued the nature of plaintiffs' claim.
Plaintiffs complain that it is the State's decisions concerning allocation of education aid which constitute the "criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race" (34 CFR 100.3 [b] [2]). *324 The complaint challenges the manner in which the State allocates education aid, alleging that the present methodology has a disparate impact on the State's racial and ethnic minorities, the vast majority of whom attend New York City public schools.[9]
The Appellate Division's reasoning fails to account for the fact that the City can only suballocate what the State allocates to it. If, as alleged, the State allocates only 34% of all State education aid to a school district containing 37% of the State's students (81% of whom are minorities comprising 74% of the State's minority student population), then those minority students will receive less aid as a group and per pupil than their nonminority peers who attend public schools elsewhere in the State, irrespective of how the City suballocates the education aid it receives.
Initially, it is undisputed that New York State is the recipient of Federal funds for education. Moreover, plaintiffs complain of a benefit distribution practice which allegedly has the effect of subjecting minority students to discrimination on the basis of their race, color, or national origin. Plaintiffs support their allegations statistically, pointing to the disparity between the total and per capita education aid distributed to the City's predominantly minority student population as opposed to the amount distributed to the State's nonminority students. Since defendants have not yet advanced a substantial justification for the challenged practice at this procedural point, plaintiffs' cause of action under the title VI regulations should be reinstated (see, Georgia State Conference of Branches of NAACP v State of Georgia, 775 F.2d 1403, 1417, supra; Groves v Alabama State Bd. of Educ., 776 F Supp 1518, 1523, supra).
The order of the Appellate Division should be modified, without costs, in accordance with the opinion herein and, as so modified, affirmed.
LEVINE, J. (concurring).
I join with the majority of this Court in holding that plaintiffs have failed to allege legally sufficient causes of action under the Equal Protection Clauses of the Federal and State Constitutions or under title VI of the Civil Rights Act of 1964, but have pleaded a valid cause of *325 action under the United States Department of Education's regulations implementing title VI. I am also of the view that, under our prevailing liberal pleading standards, the complaint states a cause of action based upon a violation of the Education Article of the State Constitution (NY Const, art XI, § 1). The complaint invokes the definition of the State's educational duty under the Constitution set forth in Board of Educ., Levittown Union Free School Dist. v Nyquist (57 N.Y.2d 27) (hereinafter Levittown) and alleges that the State's public school financing scheme denies them a "sound basic education" with "minimal acceptable facilities and services" (id., at 47-48). The complaint also refers to various specific educational deficiencies and alleges that the State's funding scheme denies New York City public school students the opportunity to achieve even basic literacy. These allegations, in my view, are sufficient to withstand the motion to dismiss, despite the inclusion and heavy reliance upon various other factors which I consider essentially irrelevant to a determination of whether the current State school aid formula violates the Education Article of the State Constitution.
I write separately regarding plaintiff's Education Article claim because the constitutional standard for a sound basic education articulated by the majority may be read to extend the State's funding obligation well beyond that envisaged by the Levittown Court or justified by the language or history of the adoption of the Education Article.

I.
Before addressing the errors and deficiencies I perceive in the majority's opinion upholding the sufficiency of plaintiffs' Education Article cause of action, I wish to explain why I am unable to agree with Judge Simons' dissent in this case, although I find much merit in its discussion of the extent of the State's constitutional responsibility for funding the State's public education system and of the inherent limitations of courts in making constitutional decisions on educational quality and quantity. That dissent concludes that it "is for other branches of government, not the courts, to define what constitutes a sound basic education" (Simons, J., dissenting in part opn, at 333). It also finds plaintiffs' Education Article cause of action deficient because their "claim [of a denial of a sound basic education] does not attempt to establish deprivation State-wide; it advances only claims involving some New York *326 City schools". (Simons, J., dissenting in part opn, at 338.) The dissent apparently concludes that the State's mandate to support the system of education is only breached upon proof of a State-wide failure of the system of public education, but not a failure (attributable to inadequate State funding) in any individual school district. I believe this position is inconsistent with the Levittown decision.
In Levittown we explicitly stated that the Education Article (NY Const, art XI, § 1) of the Constitution does require the Legislature to put in place and support "a State-wide system assuring minimal acceptable facilities and services", although not necessarily "a system assuring that all educational facilities and services would be equal throughout the State." (57 NY2d, at 47, supra [emphasis supplied].) We further defined the "constitutional mandate" as that of providing a "sound basic education" (id., at 48).
This Court in Levittown viewed from an historical perspective the funding role and responsibility of the State in the constitutional scheme contemplated when article XI, § 1 was adopted. We expressly relied upon the historical description, contained in the amicus brief of 85 local school districts, that there has been in this State a nearly 200-year tradition of a dual system of financing public education, already well in place when the Education Article was adopted in 1894, giving local school districts broad autonomy in making policy decisions on the quality and quantity of education and the funding thereof for their respective schools (see, id., at 46). We described the State's funding responsibility under the 1894 constitutional scheme as one of "assuring that a basic education will be provided [through State financial aid to local school districts]" (id., at 45 [emphasis supplied]).
These observations were historically accurate and are reflected in the history of the adoption of the Education Article. As early as 1795, the Legislature enacted a common school law providing for State aid to counties and cities to support their local schools, contingent upon matching funds raised by local taxation but not otherwise limiting local school educational expenditures; similar legislation was passed in 1812 (see, 3 Lincoln, The Constitutional History of New York, at 526-527). As we have discussed more extensively in Reform Educ. Fin. Inequities Today v Cuomo (86 N.Y.2d 279 [decided today]), the primary purpose of article XI, § 1 was to "constitutionalize the established system of common schools rather *327 than to alter its substance" (86 NY2d, at 284). Moreover, the constitutional history of the Education Article shows that the objective was to "make[] it imperative on the State to provide adequate free common schools for the education of all of the children of the State" and that the new provision would have an impact upon "places in the State of New York where the common schools are not adequate" (3 Revised Record of Constitutional Convention of 1894, at 695 [emphasis supplied]).
In my view, the dissent's conclusions that the determination of what constitutes a sound basic education for constitutional purposes is not a judicial responsibility on this constitutional challenge, and that, in any event, only a State-wide failure to provide funding for a sound basic education will give rise to a constitutional violation, are inconsistent with Levittown's description of the State's funding responsibility and with the constitutional history I have cited. The Levittown record definitely established, and the courts at all levels recognized that the State's educational aid formula produced significant variations in aggregate per pupil State aid among the various school districts (see, e.g., Levittown, 94 Misc 2d 466, 502). Also established in Levittown and found by the trial court was that the cost of the same educational services, resources or facilities varied substantially throughout the State (see, id., at 503-510). If, because of such factors or others, the State aid to an individual school district proved to be insufficient to "assure minimal adequate facilities and services" (57 NY2d, at 47, supra) or "to assur[e] that a basic education will be provided" (id., at 45), our Levittown decision certainly would lead to the conclusion that the State's constitutional educational funding responsibility, couched in those very terms, would have been violated in that school district. Moreover, the notion that only a State-wide failure to provide sufficient State funds for a basic sound education is sufficient to establish a right to relief under the Education Article is inconsistent with the constitutional debate I have previously quoted, in which it was specifically anticipated that its adoption would have an ameliorative effect upon "places * * * where the common schools are not adequate" (see, supra).
Thus, I conclude that we cannot avoid addressing the meaning and content of the constitutional mandate identified in Levittown, that the Legislature must support a public school system providing an opportunity for students to receive a sound basic education.

*328 II.
I now turn to a discussion of the serious errors I find in the majority's opinion addressing the meaning and content of that constitutional mandate, to provide school children an opportunity for a sound basic education. Analysis may profitably begin by identifying what the Levittown Court most clearly rejected as the constitutional mandate under the Education Article. Contrary to the conclusion of the majority here, the Court in Levittown not only had before it the contention that disparities in overall funding and quality of education among local school districts violated the Education Article. The Court also undisputably had before it the claim, supported by findings of fact and conclusions of law by the lower courts, that, irrespective of the existence of disparities, the school children in the plaintiff and intervenor school districts in that case were not receiving the educational opportunities guaranteed by the Education Article. Thus, without reference to disparity, the trial court adopted as the constitutional mandate in New York the construction of a comparable constitutional provision on public education by the New Jersey Supreme Court in Robinson v Cahill (62 NJ 473, 515, 303 AD2d 273) (Levittown, 94 Misc 2d, at 533, supra):
"`The Constitution's guarantee must be understood to embrace that educational opportunity which is needed in the contemporary setting to equip a child for his role as a citizen and as a competitor in the labor market'."
The trial court paraphrased that concept of the constitutional obligation as requiring the State to afford all school children the opportunity to acquire those skills "necessary to function as a citizen in a democratic society" (id.), and found that the constitutional responsibility of the State was breached by the State's inadequate funding aid to the large city school districts in the State (id., at 534).
When the Levittown case reached the Appellate Division, the majority in that Court adopted the same approach in defining the basic education guaranteed by article XI, § 1. It quoted (83 AD2d 217, 249) from Seattle School Dist. No. 1 v Washington (90 Wash 2d 476, 517, 585 P2d 71) that the educational opportunities which are constitutionally required to be furnished are those "`in the contemporary setting to equip our children for their role as citizens and as potential competitors in today's market as well as in the marketplace of *329 ideas'". The Appellate Division concluded that "we believe section 1 of article XI of the New York Constitution requires no less" (83 AD2d, at 249, supra). The Appellate Division majority found that the then-current State funding scheme violated the Education Article in failing to provide children in the school districts represented there with the skills required thus "to function in society" (83 AD2d, at 251, supra).
The majority of this Court in Levittown was also directly confronted with the position of the sole dissenter, Judge Fuchsberg, that under the State Constitution, all children "are entitled to an education that prepares today's students to face the world of today and tomorrow." (57 NY2d, at 60, supra.) The dissent also reminded the majority that both lower courts found as a fact that the State's funding scheme denied such educational opportunities for the children in the districts involved in the Levittown suit. "Those who took and tolled the testimony tell us that, by any standard that counts, for the multitudinous many no such educational opportunity truly exists." (Id.)
Despite those findings by the lower courts in Levittown, that the children in the subject school districts in that suit were denied the opportunity "to acquire the skills necessary to function as a citizen in a democratic society" (94 Misc 2d, at 533, supra) or the skills "to function effectively in society" or prepare them for "`their role as citizens and as potential competitors in today's market place'" (83 AD2d, at 248-249, supra), this Court held, as a matter of law, that the plaintiffs and intervenors in Levittown had not established (indeed, not even claimed) that the State's public education funding scheme failed to provide the educational opportunity mandated by article XI, § 1, i.e., minimal facilities and services needed for a sound basic education.
The conclusion seems to me inescapable that, if we are to faithfully follow the Levittown precedent, the concept of a sound basic education as a constitutional mandate is much more circumscribed than the aspirational, largely subjective standards expressed by the lower courts and the dissent in Levittown, representing what typically one would desire as the outcome of an entire public education process  to produce useful, functioning citizens in a modern society or, as Judge Fuchsberg put it, preparation of students "to face the world of today and tomorrow".
Thus, in my view, the majority unmistakably and unwisely *330 departs from Levittown in the majority's principal holding here that the sound basic education which is the State's funding responsibility under the Education Article includes imparting these skills "necessary to enable children to eventually function productively as civic participants" (majority opn, at 316 [emphasis supplied]). In substance and meaning, this objectively unverifiable standard is indistinguishable from the criteria for the constitutional norm expressed by the trial court and Appellate Division in Levittown. The majority's error is further compounded and reinforced by the majority's reference to plaintiffs' allegations, which the majority apparently considers relevant on plaintiffs' cause of action under the Education Article, that New York City students are being deprived of the opportunity, among other things, to "be knowledgeable about political, economic and social institutions and procedures in this country and abroad" (majority opn, at 319).
Having demonstrably rejected similar standards, the manifest teaching of Levittown is that the State's constitutional educational funding responsibility does not nearly extend to guaranteeing students the opportunity to acquire those skills to "function productively as civic participants", as the majority would have it. The narrower State role, as the Levittown decision explains, flows necessarily from New York's historical tradition of dividing responsibility over public education between the State and local school governments, under which the quality of public education necessary to enable students to "function in society" is largely a matter of local decision and control subject to standards and assistance from the appropriate State executive, legislative and administrative bodies (see, Levittown, 57 NY2d, at 45-46, supra). As previously pointed out, that division of responsibility was constitutionalized in the adoption of article XI, § 1.
That this Court in Levittown construed the Constitution as imposing only a drastically limited State funding responsibility for guaranteeing the quality of public school education also stems from the Levittown majority's awareness of the inherent and proper limitations of the courts in enforcing the constitutional obligation. The Levittown decision cogently pointed to the "enormous practical and political complexity" (57 NY2d, at 38, supra) of deciding upon educational objectives and providing funding for them which, under our form of government, are legislative and executive prerogatives upon which courts should be especially hesitant to intrude (id., at 39; see also, id., at 49, n 9). Again, the majority here disregards *331 the prudent and jurisprudential advice of Levittown and appears ready to fully enter this arena in delineating a series of "essentials" to which "[c]hildren are entitled" under the Constitution, including such things as "minimally adequate teaching of reasonably up-to-date curricula" on a wide variety of subjects, "reasonably current textbooks" and "minimally adequate" educational physical plant and equipment (majority opn, at 317). Presumably the determination of the adequacy of all such educational resources will be made by the Trial Judge in this case.
The true, far more limited nature of the State's constitutional responsibility to fund a sound basic education can be gleaned, again, from the language of the Education Article itself and the Levittown opinion. As is well explained in Judge Simons' dissent, article XI, § 1 does not explicitly designate a State responsibility regarding any minimum quality of education. It expressly imposes only the duty upon the Legislature to "provide for the maintenance and support of a system" of free public education (NY Const, art XI, § 1 [emphasis supplied]). The Levittown Court emphasized that the constitutional mandate is solely to maintain a system of education (57 NY2d, at 48, n 7). The Court observed that, concededly, a system of public schools did exist in the State through legislation and regulation and appropriations for maintenance of various State-wide minimum educational standards, etc. (id., at 48). The Court then identified the only remaining element of the State's constitutional responsibility under article XI, § 1:
"If what is made available by this system * * * may properly be said to constitute an education, the constitutional mandate is satisfied." (Id. [emphasis supplied].)
Thus, the sound basic education envisaged by the Levittown Court as a constitutional mandate subsume those minimal categories of instruction without which whatever the system provides cannot "be said to constitute an education". Historically and traditionally, the essential, universally recognized as indispensable elements, the sine qua non, of what legitimately might be called an education are the basic literacy (reading and writing) and computational skills and, in a public educational system, citizenship awareness. A public educational system failing to provide the opportunity to acquire those basic skills would not be worthy of that appellation.
*332 Of course, almost all of us would hope for, expect and support as voters and taxpayers funding of a system of public education in this State which offers more than those basics in all school districts, including the furnishing of many of those resources and subjects of instruction plaintiffs claim to be constitutionally mandated and those which, regretably, may be implied as required from the majority's interpretation of the Education Article. But Levittown held that decisions regarding such concededly worthwhile educational supplements, including the selection thereof and the level of such funding, is to be determined in other forums than by judicial fiat in interpreting the State Constitution. Levittown cannot fairly be interpreted as mandating more than the provision of a system in which all children in the State are given an opportunity to acquire basic literacy, computational skills and knowledge of citizenship as the elements of a sound basic education. Deficiencies beyond those basics were certainly established in the Levittown record, and were found to exist by both lower courts in that case. Yet this Court in Levittown not only found no deprivation of a sound basic education had been proven, it found none had been claimed.
The majority's significantly less precise or exacting standard for the sound basic education constitutionally required to be provided invites and inevitably will entail the subjective, unverifiable educational policy making by Judges, unreviewable on any principled basis, which was anathema to the Levittown Court.
As I have previously discussed, however, the complaint can be read as alleging that the State's funding scheme denies New York City school pupils the opportunity to acquire the basic literacy and mathematical skills. I, therefore, vote with the majority that plaintiffs' cause of action under the Education Article of the State Constitution is legally sufficient.
SIMONS, J. (dissenting in part).
There can be no argument about the importance of educating our children or that there are serious shortcomings in the New York City school system. But it is possible to recognize those serious social concerns and still conclude, as I do, that plaintiffs have not successfully pleaded a cause of action charging defendants with violating the Education Article of the State Constitution.
Plaintiffs allege in their first cause of action that defendants have violated article XI, § 1 of the New York State Constitution because children in New York City have been deprived of *333 a sound basic education. They support that conclusion by a number of allegations identifying shortcomings in instruction, facilities and student performance in the City's schools. The majority[1] and Judge Levine in his concurrence conclude this states a cause of action because they interpret the Education Article as containing a qualitative component. In their view, the Constitution guarantees that all school-age children shall receive a sound basic education. They hold that the definition of a sound basic education, and the standard against which the City's schools are to be measured, is to be judicially determined. If the instruction, facilities and student performance in New York City schools fail to meet that standard, the State has violated the Constitution and must respond to correct the deficiencies in the City's school system. The majority and Judge Levine differ only on the particulars of the education which the Court should decree necessary.
My review of the history of the Education Article and our Levittown decision interpreting it (Board of Educ., Levittown Union Free School Dist. v Nyquist, 57 N.Y.2d 27) (hereinafter Levittown) leads me to a different conclusion. I believe that the constitutional duty is satisfied if the State creates the structure for a State-wide system of schools in which children are given the opportunity to acquire an education and supports it. It is for other branches of government, not the courts, to define what constitutes a sound basic education and, assuming the State has not defaulted on its duty to establish a State-wide system and provide financial support, to ensure that the opportunity to be educated is available to all. In my view, plaintiffs have not successfully pleaded that the State has violated that duty.
I therefore dissent from so much of the majority's decision as sustains plaintiffs' first cause of action alleging a violation of article XI, § 1 of the New York State Constitution.

I
At the outset, it is helpful to remember that the responsibility for primary and secondary education in New York has been historically, and is by law, a joint undertaking of the State and local school districts. The State, acting through the Legislature and the constitutionally created Board of Regents, establishes standards for curricula, faculty and facilities and *334 annually provides financial aid to the local districts. In 1994-1995 the State distributed almost $10 billion in State funds to school districts in New York State. The New York City School District received over one third of that sum (see, Report of Education Unit, New York State Div of Budget, Oct. 31, 1994, at 16-17, 26-27). Although individual districts no longer enjoy the power to establish the criteria for instruction and facilities they once had, they remain charged with administering the schools in their districts and possess broad powers for that purpose. They also supply a major part of the funding necessary to support and maintain their schools. They do so by determining annual expenses and, after crediting that sum with State and Federal aid, raising the balance by local taxation.
In the past, the financial needs of the New York City School District were supported by a greater proportion of local funds than State funds. Since 1983, however, the amount of money contributed by the City has steadily declined while the amount contributed by the State has increased. The State now contributes more to the funding of City schools than does the City. This increase in State aid has not, however, resulted in increased or improved services, only in a reduction in City appropriations for education (see, Chancellor's Budget Estimate, 1995-1996, Board of Educ of City of NY, at 14). The question before the Court on this appeal, broadly stated, is whether the Constitution requires the State to provide an even greater share of the funds than it now does to defray the cost of operating the New York City schools.

A
Analysis begins with the language of the Constitution. The Education Article provides:
"The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated." (NY Const, art XI, § 1.)
The words, with utter simplicity, impose a duty on the State to create a "system" for free public education available to all children and to support it. Conspicuously absent are descriptive words, establishing a qualitative or quantitative standard for the education the State must provide. Thus, if the drafters intended to impose on the State a substantive requirement for instruction and facilities, or provide that the State is ultimately *335 responsible for any shortage of funds in individual school districts, it must be found in the history of the Article, not its words.
The section was adopted in 1894 at a time when there were more than 11,000 independent school districts in the State offering vastly different educational opportunities (see, 3 Lincoln, Constitutional History of New York, at 550-551). The Convention record reveals that the section was proposed to "express[ ] the principle of universal education, and direct[ ] the Legislature to use the power of the State to foster that principle" (3 Revised Record of Constitutional Convention of 1894, at 691). Its "evident purpose [was] to impose on that body the absolute duty to provide a general system of common schools" (3 Lincoln, Constitutional History, op. cit., at 554). Thus, it was said the Legislature must provide "not simply schools, but a system; not merely that they shall be common, but free, and not only that they shall be numerous, but that they shall be sufficient in number, so that all the children of the State may * * * receive in them their education" (id., at 555). The delegates' concern was focused on establishing a State-wide system of free education. The quality of that education was mentioned only in passing, a delegate stating that it should be "adequate" (3 Revised Record on Constitutional Convention, op. cit., at 695). I find no indication that the drafters intended to go beyond this and impose a qualitative component within the Education Article, or to hold the State liable to make up a shortage of funds in particular school districts.

B
Reviewing this history in Levittown (57 N.Y.2d 27, supra), we concluded that the section was intended to require "a State-wide system assuring minimal acceptable facilities and services in contrast to the unsystematic delivery of instruction" which existed when the Constitution was adopted (Levittown, supra, at 47).
Levittown, of course, involved a different claim than is asserted here: it dealt with the inequality or disparity of the education offered in various districts of the State whereas plaintiffs here assert that the students of New York City's schools have been deprived of an education meeting constitutional standards. Nevertheless, the Levittown Court interpreted the Education Article and the majority, Judge Levine *336 and I all rely on that interpretation to support our differing views. The majority and the concurrence conclude that the Levittown decision does not foreclose the courts from defining the ingredients of a sound basic education and ordering the State to assume responsibility for providing it. They find in Levittown an "unambiguous acknowledgement of a constitutional floor with respect to educational adequacy," and from that, assume the power of the courts to override the legislative and executive determinations of what and how much the system must provide (majority opn, at 315). The majority believes that the Levittown Court analyzed the article only so far as was necessary to address inequality and maintains that it is acting consistently with that precedent and only resolving issues the Levittown Court left unanswered. I conclude that the Levittown Court fully considered and determined the scope of the constitutional duty. Our differing interpretations of the same opinion requires a detailed consideration of it.
The decision is best understood by first reviewing the analysis made by the Appellate Division and then this Court's disposition of the matter. The Appellate Division unanimously agreed in Levittown, though for different reasons, that the Education Article had been violated (83 AD2d 217). Three Justices, speaking through Justice Lazer, stated that the State's educational finance system was unconstitutional because it created interdistrict variances in educational quality which disadvantaged urban children (id., at 247-251). Acknowledging that article XI, § 1 was "devoid of semantic adornments", the Court nevertheless amplified its wording to attribute to the section concepts of a "thorough and efficient" school system and an "ample" education, importing qualifying words found in the Constitutions of the States of New Jersey and Washington but not found in the Constitution of New York (id., at 248). Though acknowledging that our Constitution did not explicitly mention a quantitative and qualitative standard, the Appellate Division nevertheless added one, requiring the State to insure that all children are equipped with "certain basic educational skills necessary to function effectively in society" (id., at 248). The Appellate Division looked to statutes (e.g., Education Law § 3204) and to the Regulations of the Commissioner of Education (8 NYCRR part 100) defining the approved curricula to determine the scope of a constitutional guarantee. The mere existence of these standards did not satisfy the Constitution they said; student performance must meet the Commissioner's standards (83 AD2d, at 249-250). *337 In sum, the Court made a qualitative analysis of the State educational system based upon the degree to which the Commissioner's standards were fulfilled and, finding performance levels below those standards in some districts, concluded the cause was insufficient State funding. Accordingly, the Appellate Division held the State had failed to "support and maintain" a State-wide system of schools.
Justice Hopkins agreed that the Education Article had been violated but he analyzed the constitutional mandate differently (83 AD2d, at 266-269). He found three key ideas conveyed in the language of article XI: first, a duty was imposed on the Legislature; two, the duty included maintenance and support of a system of common schools; and third, the system had to be available to all children of the State. He found the Legislature had failed to "support and maintain a system of free common schools" because the statutes distributing State aid had become irrational, a "patchwork mounted on patchwork", a "maze of convoluted intricacies." He concluded the financing was unconstitutional because it was unsystematic (id., at 268-269).
When the matter reached this Court, we modified the determination of the Appellate Division, construing the Education Article more narrowly and concluding that the Legislature had not violated it. The Appellate Division read a qualitative component into the Education Article because, it said, absent such a component the clause would be "without parameters" (83 AD2d, at 248). We had no difficulty identifying the substance of the provision, however, concluding that it mandated only that the State support and maintain a system of free schools available to all children. We held that the guarantees of the Article had been satisfied because, in the words of the Court, "[t]he Legislature has made prescriptions * * * with reference to the minimum number of days of school attendance, required courses, textbooks, qualifications of teachers and certain nonteaching personnel, pupil transportation, and other matters. If what is available by this system * * * may properly be said to constitute an education, the constitutional mandate is satisfied." (57 NY2d, at 48.) In other words, the Levittown Court concluded that the system of which the Constitution speaks is a framework of educational programming and, implicitly, regulatory oversight of compliance with that framework. We concluded further that the State manifestly had "supported and maintained" the system because State appropriations for the New York public school system, *338 judged by the fiscal contributions of other States, far exceeded those of all but two others. Based upon those determinations, we held that "a sound basic education" was available for all children in the State and thus the constitutional mandate was satisfied. We rejected the extensive qualitative analysis of the lower courts, holding that the courts were not free to review the adequacy of the appropriations, except, "possibly", in the case "of gross and glaring inadequacy" of State funding (57 NY2d, at 48-49). In sum, we fully interpreted the Education Article, concluding that the State had met its constitutional obligation because it had created a system  it had defined a sound basic education and the facilities necessary to provide it  and appropriated substantial financial aid to local school districts to support and maintain that system.
The plaintiffs in this action do not contend that the State has defaulted in defining the ingredients of the State-wide system, nor do they allege that the State funding to maintain and support it is grossly inadequate. The position of plaintiffs, the majority and the concurrence is that the State must do more. It must not only set up the structures of a State-wide system, define the ingredients and provide aid to local districts, it must step in with additional financing to ensure that an "education", as defined by the courts, is fully developed and successful in each of the local school districts. The Levittown Court had before it the same analysis adopted by the majority here, in Judge Fuchsberg's dissent and in the opinion of the Appellate Division majority, and rejected it (see, 57 NY2d, at 49, n 9).

C
Plaintiffs have not and cannot successfully plead that the present statutory provisions for allocation of State aid to local school districts for the maintenance and support of elementary and secondary education violate the State Constitution as we interpreted them in Levittown.
First, plaintiffs' claim does not attempt to establish deprivation State-wide; it advances only claims involving some New York City schools. They contend, and the majority and concurrence agree, that the State's duty is to be measured district by district and requires the State to provide additional funding to rehabilitate ailing districts even though the constitutional obligation is met State-wide. The concurrence supports that position by relying on language from the constitutional debates *339 to the effect that the new duty would ameliorate conditions in places "`where the common schools are not adequate'" (concurring opn, at 327 [quoting from 3 Revised Record of Constitutional Convention of 1894, at 695]). But the constitutional mandate to support the system of common schools is general in its terms and there is nothing in the debates to suggest that the quoted language meant more than that the Legislature should prescribe standards for a State-wide curricula and facilities to upgrade common schools with inferior standards. Certainly, nothing in the historical materials suggests that the State must step in when a district fails to meet statewide standards and increase State funding to that locality until a satisfactory performance level is achieved.
Confining their argument to New York City's schools, plaintiffs claim deprivation because selected community school districts in the City have inadequate facilities, low student performance ratios and high dropout rates. They have stated those claims by comparing their circumstances to the rest of the State and by comparing the condition of their schools and the performance of City students to the Regents' standards for school registration.[2] Their complaint sounds remarkably similar to the complaint of the Levittown plaintiffs and, as a unanimous Appellate Division held, states no more than a claim based on interdistrict disparity.
Plaintiffs further support their claims by assertions that students in New York City make less than "normal progress" than students in other parts of the State, that they perform poorly on achievement tests, and that City children earn fewer Regents' diplomas than students elsewhere in the State. The failure to make "normal progress" does not constitute deprivation and, as plaintiffs' own statistics prove, most students, even in New York City, perform at acceptable levels. *340 Manifestly, then, the State is providing children with the opportunity for a sound basic education.

II
Having determined that there is a qualitative component in the Education Article, and that the allegations of subpar performance and facilities in New York City alone state a cause of action, the majority approve judicial review of the State funding scheme. But this Court in Levittown clearly stated that judicial review of the State funding scheme would only be warranted if it appeared there had been a "gross and glaring inadequacy" in State funding (Levittown, 57 NY2d, at 48, supra). In holding that plaintiffs here have stated a cause of action, the majority simply ignores this limitation on our powers.
Thus, even if I were to accept the majority's analysis that the Constitution guarantees a certain level of instruction and performance and assume that plaintiffs have sufficiently alleged that it has not been satisfied, I still believe plaintiffs have failed to state a cause of action because they have failed to sufficiently plead that State aid to education is grossly inadequate. Unless they can sustain that element, we have no power to declare that defendants must accept responsibility for and cure the shortcomings of the New York City School District.
Plaintiffs allege only in the most conclusory form, and the majority assume without discussion, that the State funding is grossly inadequate and that there is a causal connection between it and the instruction and facilities provided New York City school children and their performance. But the State appropriates almost $10 billion for school aid State-wide  approximately one sixth of the money appropriated for all State purposes  and the New York City School District receives more than a third of it. Even if the State's obligation were imposed district by district, current State appropriations to New York City do not approach a "gross inadequacy" in State funding.
Plaintiffs also complain that they enroll 37% of the State's public school population but receive slightly less than 35% of the total State aid distributed. There is no constitutional requirement, however, that the State maintain exact parity in the financial aid distributed to the several thousand school districts. Insofar as plaintiffs attack the formula by which *341 State aid is calculated, or allege that it is inequitable, their claim is similar to the claim Justice Hopkins accepted in Levittown (83 AD2d, at 266). It was rejected by this Court (see, 57 NY2d, at 48, n 7).
Moreover, there is serious doubt that plaintiffs can establish that any claimed deficiency in the State funding scheme has caused a deprivation of educational opportunity to City students. These claims against the State are presented at a time when New York City is reducing its funding to the City School District when measured both in terms of the dollars appropriated and the percentage of its municipal budget allocated to education (see, Chancellor's Budget Estimate, 1995-1996, op. cit., at 14). And these reductions have occurred even though the City is among municipalities having the lowest residential property tax rate for school purposes in the State and devotes the lowest percentage of its tax revenue to education. The Chancellor of the City School District has stated that the City contributes approximately 20% of its revenues to education, whereas the percentage contributed to education by other localities in the State is almost twice as much (see, Chancellor's Budget Estimate, 1995-1996, op. cit., at 14). Based upon this evidence, a court could justifiably conclude as a matter of law that the shortcomings in the City schools are caused by the City's failure to adequately fund City schools, not from any default by the State of its constitutional duty.

III
Of course, the majority may interpret the State Constitution, or our Levittown decision, as mandating a level of student performance and authorizing judicial determination of the curriculum and facilities and State funding necessary to achieve that level if it chooses, but I believe it unwise to do so for several reasons.
The first was stated by the Levittown Court. In an opinion fully sensitive to the political process by which we are governed and the separation of powers concerns which restrain courts from interfering with responsibilities resting elsewhere, Levittown defined the standard for measuring the constitutional requirement and properly avoided a judicial determination of the highly subjective and policy-laden questions of how much (or little) students must be taught or how well (or poorly) they must perform before a court should intervene. The courts, we held, were not to interfere in constitutional *342 responsibilities assigned to other branches of government unless the executive and legislative branches had, in effect, defaulted on their duty to establish a State-wide system of education and fund it. I find that reasoning persuasive.
The State Legislature, in which New York City is amply represented, annually investigates and reviews the educational needs of the various school districts, and may conduct hearings to solicit further views if it deems them necessary. Based upon the information available to it, the Legislature distributes billions of dollars of educational aid throughout the State. Surely the legislators are aware that the quality of the educational opportunity in some districts in New York City is inferior to the opportunity in other districts in the City and State. If they conclude that resources of the State call for a certain level of funding notwithstanding those problems and if that funding is not "grossly inadequate", it is not for us to force the State to do more. The Legislature is far more able than the courts to balance and determine State-wide needs and equities and, I need hardly mention, such determinations are well within its constitutional domain.
The majority apparently view the constitutional provision as establishing an entitlement to receive an adequate education. It assumes that there is a point at which the education available is so palpably inadequate that the courts must intervene, determine the extent of the inadequacy and order the problem solved at State expense. And the courts may impose this duty on the State, the majority holds, even though the State has established a structure for the school system and provided adequate funding for it as measured by the State's resources.
If we were dealing with a constitutional right personal to each child in New York, then the Court's power to override the majority's will to protect those rights might be justified. But the Education Article states a general duty. The Constitution is satisfied if the majority has worked its will through its elected officials and their action represents a reasonable response to the duty imposed. The courts have the power to see that the legislative and executive branches of government address their responsibility to provide the structure for a State-wide school system and support it but we have no authority, except in the most egregious circumstances, to tell them that they have not done enough.
Finally, it is not clear whether increased State aid to New *343 York City is to be provided by increasing appropriations for education generally, or reallocating the current State-wide appropriations so that New York City schools receive a greater share of the aid appropriated.[3] If State aid to education is to be generally increased, the increase will necessarily be achieved at the expense of other equally meritorious programs deprived of some portion of the State resources previously used to fund their activities. If there is to be a reallocation of State aid to provide greater funding for New York City  or a reconstruction of the State aid formula for that purpose  the reallocation will be achieved at the expense of other school districts in the State. They will then be forced to increase local taxes to fund education for their districts and to do so at a time when New York City is reducing its municipal appropriations for education. Judicially compelling either course encroaches on the Legislature's power to order State priorities and allocate the State's limited resources.
This assumption of power in the field of education sets a precedent for other areas that will be hard for the courts to resist in the future. The State Constitution is a voluminous document covering not only the distribution and scope of power, but also addressing dozens of other matters as diverse as public housing, nursing homes, canals, ski trails and highways. The State, to a greater or lesser degree, is directed to maintain and protect all those services and facilities. It cannot be that each of them are matters calling for quantitative and qualitative judicial oversight in their funding and operation.
To explore just one example, the New York State Constitution provides, in language similar to that contained in article XI, § 1, that the State "shall" provide "aid, care and support of the needy" (NY Const, art XVII, § 1). There is, and probably always will be, a profound public debate over who should be eligible for public assistance and whether the levels of assistance are too high or too low. We have assiduously avoided making quantitative and qualitative determinations in this area in the past, concluding that those are questions for the *344 legislative and executive branches to decide (see, Hope v Perales, 83 N.Y.2d 563, 578; Matter of Barie v Lavine, 40 N.Y.2d 565; Matter of Bernstein v Toia, 43 N.Y.2d 437). If the Court is to assume the responsibility of determining what level of educational services and student performance must be achieved under the Constitution, I know of no legal answer for those who will contend that we must resolve similar questions challenging compliance with the Social Welfare Article or other sections of the Constitution.
The temptation to address these school problems judicially is understandable. But the Constitution provides for particularized areas of responsibility and it is not for the courts to mandate that the State must spend more of its finite resources for education and less, say, for housing the poor or healing the sick. Nor is it for us to say that the current resources devoted to education are to be transferred to one part of the State to the loss of others. Those are choices delegated to the people's elected representatives, not Judges, and in the absence of their manifest failure to address the problem, the judiciary should refrain from interfering.
Accordingly, I would dismiss plaintiffs' first cause of action asserting defendants have violated article XI of the State Constitution.
SMITH, J. (dissenting in part).
I agree with and join the majority opinion in upholding the causes of action based on the Education Article of the New York State Constitution and on a violation of title VI's regulations. I conclude, in addition, that the complaint states a valid equal protection claim under both the Federal and State Constitutions. I would, therefore, reverse this aspect of the Appellate Division decision and deny the motion to dismiss the equal protection claims.
Judge Ciparick agrees only that plaintiffs have made a valid State equal protection claim.

THE FEDERAL EQUAL PROTECTION CLAIM
Introduction
The present case should be viewed in its historical context. At least since the latter part of the nineteenth century, African-Americans in New York State have sought equality of education. Like many other parts of the Nation, New York segregated its schools on the basis of race. The end of segregation by law did not end efforts to exclude African-Americans *345 from equal educational opportunities. Much of the twentieth century has been spent by African-American parents and students fighting for equality of education.
Plaintiffs have a right to demonstrate that they are receiving less than a minimal basic education. The Equal Protection Clauses of both the Federal and State Constitutions stand for the proposition that State action, through selective and biased funding, cannot be used to condemn African-American, Latino or other children to an education which is inherently inferior.
While the thrust of the decision in Brown v Board of Educ. (347 US 483) was that separate facilities, no matter how similar in terms of resources, were inherently unequal, one underlying fact in those cases was that the resources of the separate schools were unequal. And that fact led to the argument of a denial of equal protection.
The Historical Setting
New York State, like many other States, had a history of segregated schools required by law. In 1864, New York State enacted the "Common School Act" (L 1864, ch 555, tit 10, § 1), which authorized school authorities in cities and incorporated villages to establish separate schools for the education of the "colored" race. This Act empowered school authorities to establish schools for the exclusive use of colored children and authorized such authorities to exclude colored children from schools provided for white children. In 1873, the State enacted the Civil Rights Act (L 1873, ch 186) providing that persons of color shall have full and equal enjoyment of any accommodation, advantage, facility or privilege furnished by teachers and other officers of common schools and public institutions of learning.
Chapter 556 of the Laws of 1894 (art 11, tit 15, §§ 28-30), again provided for the organization and creation of separate schools for colored children in cities, villages, union districts and school districts organized under a special act. The language of section 31 of that same article provided that colored schools in the City of New York "shall be open for the education of pupils for whom admission is sought, without regard to race or color."
Chapter 492 (§ 1) of the Laws of 1900 expressly provided that "[n]o person shall be refused admission into or be excluded from any public school in the state of New York on account of race or color." Further, section 2 of that chapter repealed section 28 (art 11, tit 15) of chapter 556 of the Laws *346 of 1894 regarding the establishment of separate schools with equal facilities for colored children in any city or incorporated village.
Under chapter 140 of the Laws of 1910, section 920 of the Education Law provided that "no person shall be refused admission into or be excluded from any public school in the state of New York on account of race or color." However, section 921 of that same chapter again expressly provided for separate schools for colored children should the inhabitants of any district determine. This apparent inconsistency in the law, of generally prohibiting exclusion from public schools on account of race, but expressly making available the option to establish separate schools, permitted the continuance of segregated schools by law. The gravamen of such disparity resulted in the disparate impact upon the education of children, detrimentally and adversely affecting children of color.
Such dissimilar treatment in education of children was supported by decisions of this Court. People ex rel. King v Gallagher (93 N.Y. 438 [1883]) involved the denial of admission of a 12-year-old black girl to a local public school in Brooklyn because of her race. The majority affirmed the lower court's denial of admission to the school because the school was open only to white children. The Court determined that the principal of the school, as administrator, was within his discretion to deny the child admission because she was black. Citing the Common School Act of 1864, which authorized the establishment of separate schools for the education of the colored race within the State, the Court held that such separate schools were not an abrogation of the Privileges and Immunities Clause of the Fourteenth Amendment of the United States Constitution. No impairment was found by the City of Brooklyn requiring separate but equal educational facilities. The Court further determined that notwithstanding the Civil Rights Act of 1873 (L 1873, ch 186), repealing and annulling any statute which discriminated against persons of color (93 NY, at 456), the establishment of separate schools for black and white children was not discriminatory. Judge Danforth dissented, finding the requirement that black children attend schools designated only for black children was unequal and in violation of the laws protecting equal rights.
Further, in People ex rel. Cisco v School Bd. (161 N.Y. 598 [1900]), this Court similarly held that the School Board of Queens was authorized to maintain separate schools for the education of "colored" children and to exclude such children *347 from schools designated for "white" children only. Citing its earlier holding in Gallagher (supra) the Court reasoned that the Civil Rights Act of 1873 required that equal school facilities and accommodations be furnished, not equal social opportunities.
With the passage of legislation prohibiting the exclusion of blacks from schools on the basis of race, the official policy of the State became one of nondiscrimination against black children. Nevertheless, as several cases have shown, the efforts of some governmental officials have continued the previous State policy of racial exclusion. Thus, over the years, a number of lawsuits have been brought to eliminate the exclusion of blacks from white schools (see, for example, Taylor v Board of Educ., 191 F Supp 181, 195 F Supp 231, affd 294 F.2d 36, cert denied 368 US 940, decree mod 221 F Supp 275; United States v Yonkers Bd. of Educ., 837 F.2d 1181; Hart v Community School Bd. of Educ., 512 F.2d 37).
While the major thrust of efforts to fight unequal treatment of black students has been desegregation, at the same time black parents and pupils have insisted that the facilities and opportunities available to black students have been grossly inferior to those available to white students and have challenged that state of affairs on equal protection grounds. Thus, Brown v Board of Educ. (347 US 483, supra) was clearly decided on the assumption that facilities and other tangible factors of segregated schools were equal even though it was clear that in many instances, the segregated schools were unequal. The Court stated:
"We come then to the question presented: Does segregation of children in public schools solely on the basis of race, even though the physical facilities and other `tangible' factors may be equal, deprive the children of the minority group of equal educational opportunities? We believe that it does." (347 US, at 493.)
Despite this assumption by the Supreme Court in Brown, at least two of the complaints in the five cases decided there attacked the inequality in black schools when compared to white schools. The allegations of inadequate education made against the State here are similar to claims of inadequacy made in Brown. To the extent that such claims are alleged to be based upon the deliberate action of the State, plaintiffs should be given the opportunity to prove their assertions.
*348 In their complaint in Brown, plaintiffs questioned "whether the denial to infant plaintiffs, solely because of race, of educational opportunities equal to those afforded white children was in contravention of the Fourteenth Amendment of the United States Constitution as being a denial of the equal protection of the laws." In Briggs v Elliott, another case reversed in Brown, the plaintiffs similarly alleged in their complaint that the "public schools of Clarendon County, South Carolina set apart for white students and from which all Negro students are excluded were superior in plant, equipment, curricula, and in all other material respects to the schools set apart for Negro students." Plaintiffs argued further that "the defendants by enforcing the provision of the Constitution and laws of South Carolina excluded all Negro students from the `white' public schools and thereby deprived plaintiffs and others on whose behalf the action is brought solely because of race and color, of the opportunity of attending the only public schools in Clarendon County where they can obtain an education equal to that offered all qualified students who are not of Negro descent" (see also, Davis v County School Bd., 103 F Supp 337, 340-341).
In Gebhart v Belton (32 Del Ch 343, 87 A2d 862), another case decided in Brown, the plaintiffs, elementary and high school Negro children, brought an action in the Delaware Court of Chancery seeking to enjoin enforcement of provisions of that State's constitutional and statutory code requiring segregation in the public schools. The court found for the plaintiffs and ordered the immediate admission of the Negro children into schools that were formerly for white children only. The court determined that the separate educational facilities were inherently unequal, finding the white schools superior to the Negro schools with respect to pupil-teacher ratio, physical plants, teacher training, aesthetic considerations, extracurricular activities, and time and distance involved in the student's travel to and from school. The court concluded that the State, through its agencies, had violated the plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment, by pursuing a policy of segregation in education which resulted in Negro children, as a class, receiving educational opportunities substantially inferior to those available to white children otherwise similarly situated.
The plaintiffs in the New Rochelle school case also alleged a disparity in the quality of education available to black and *349 white students.[1] The court found it unnecessary to consider those claims in the light of Brown.
The Present Allegations and Federal Law
One of the major issues here is what level of scrutiny the courts must give to the plaintiffs' equal protection claims  minimal or rational basis, intermediate or strict. The minimal level of scrutiny tests whether a classification or statute "bears some fair relationship to a legitimate public purpose" (Plyler v Doe, 457 US 202, 216 [1982]; see also, Alevy v Downstate Med. Ctr., 39 N.Y.2d 326, 332). This standard has often been applied in cases dealing with economics and social welfare (id.). Strict scrutiny applies where a law operates to the disadvantage of a suspect class, or a fundamental constitutional interest is alleged to have been violated (Plyler v Doe, supra, at 216-217; San Antonio School Dist. v Rodriguez, 411 US 1, 18-44; Alevy v Downstate Med. Ctr., supra, at 332). An intermediate level of scrutiny has been applied to legislative classifications which are not "facially invidious" which, nevertheless, "give rise to recurring constitutional difficulties" and require "the assurance that the classification reflects a reasoned judgment consistent with the ideal of equal protection by inquiring whether it may fairly be viewed as furthering a substantial interest of the State." (Plyler v Doe, supra, at 217-218; Alevy v Downstate Med. Ctr., supra.) Plaintiffs assert that intermediate scrutiny should be the standard used here. I conclude that the facts alleged require at least a standard of intermediate scrutiny.
Defendants rely essentially on three cases in concluding that the Equal Protection Clause of the Fourteenth Amendment is not violated  (1) San Antonio School Dist. v Rodriguez (supra), (2) Plyler v Doe (supra) and (3) Board of Educ., Levittown Union Free School Dist. v Nyquist (57 N.Y.2d 27 [1982]) (hereinafter Levittown).
Plaintiffs' basic contention, distinguishing this case from Rodriguez and Levittown, is the assertion that the pupils in question are not receiving a minimal basic education sufficient to prepare them for contemporary society including, but not limited to, basic literacy, calculating and verbal skills. If such allegations can be proved and it can further be shown that (1) the property tax funding of schools and or (2) the State allocation of its resources is discriminatory, plaintiffs may be *350 entitled to a decision in their favor, in my view, on Federal equal protection grounds as well as on the Education Article ground which a majority of the Court upholds.
In the complaint here, plaintiffs allege that they are not receiving a minimal basic education as the result of the funding system in the State and further buttress that claim with specific allegations. In addition, the complaint addresses the disparate impact of the funding system on minorities.
It is clear that the Supreme Court has not decided the issue raised here, that a minimal basic education is fundamental and should receive heightened scrutiny. The Court noted such in Papasan v Allain (478 US 265), where it stated:
"The complaint in this case asserted not simply that the petitioners had been denied their right to a minimally adequate education but also that such a right was fundamental and that because that right had been infringed the State's action here should be reviewed under strict scrutiny. App. 20. As Rodriguez and Plyler indicate, this Court has not yet definitively settled the questions whether a minimally adequate education is a fundamental right and whether a statute alleged to discriminatorily infringe that right should be accorded heightened equal protection review." (478 US, at 285 [emphasis supplied].)
The Rodriguez case also does not preclude the claims made here. In Rodriguez, the Supreme Court held that the Texas system of funding education did not violate the Equal Protection Clause of the Fourteenth Amendment. There, Mexican-American parents brought a class action attacking the funding of the Texas educational system. One main difference between that case and this is that Rodriguez involved no allegation that the education of the children was inadequate.[2]
*351 A second point in Rodriguez was that there was no showing that the Texas system of financing schools operated to the disadvantage of a suspect class. If it did, the Court noted, the financing scheme would come under strict scrutiny. Instead, the Court concluded that rational basis was the appropriate test. The Court stated:
"This, then, establishes the framework for our analysis. We must decide, first, whether the Texas system of financing public education operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny. If so, the judgment of the District Court should be affirmed. If not, the Texas scheme must still be examined to determine whether it rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment." (411 US, at 17 [emphasis supplied].)
In Plyler, the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment was violated by denying children of illegal aliens a basic education.[3] While the Court found in Plyler that there was no fundamental right to an *352 education, it applied an intermediate level of scrutiny and held that where a discrete group (children of illegal aliens) was being denied the right to an education, the State had to show a compelling State interest. The Court stated:
"If the State is to deny a discrete group of innocent children the free public education that it offers to other children residing within its borders, that denial must be justified by a showing that it furthers some substantial state interest. No such showing was made here." (457 US, at 230.)
To prove a violation of the Equal Protection Clause of the Fourteenth Amendment, the plaintiffs must prove intentional discrimination. This intent does not have to be overt and express. It is clear that the complaint alleges that the educational funding by the State has a disparate impact on minority students. The complaint also sufficiently alleges intentional discrimination.[4] After addressing the disparities and inequalities of education for minority students, the complaint states the following:
"76. Over the past ten years, despite knowledge of the facts set forth in the preceding paragraphs, and despite recommendations for major reforms in official reports issued by commissions created by the defendants themselves, the defendants have reenacted the inequitable state aid scheme without substantial modification to address the blatant inequities and their disproportionate impact on minority students, or to ensure that all students throughout the state of New York have available to them the resources necessary to obtain an education *353 meeting or exceeding the Regents' minimum statewide standards. Defendants have refused to act, even though the detrimental impact of their failure to provide equitable levels of funding on minority students was well-recognized and reasonably foreseeable."
It is also important to note that intent need not be shown on the face of legislation and that disparate impact is only one of the factors by which intent is shown. This is clear in quotations from both Washington v Davis (426 US 229 [1976]) and Arlington Hgts. v Metropolitan Hous. Dev. Corp. (429 US 252 [1977]). In Washington v Davis the Supreme Court stated:
"The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race. It is also true that the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups. Bolling v Sharpe, 347 US 497 (1954). But our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional solely because it has a racially disproportionate impact * * *.
"This is not to say that the necessary discriminatory racial purpose must be express or appear on the face of the statute, or that a law's disproportionate impact is irrelevant in cases involving Constitution-based claims of racial discrimination. A statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on the basis of race * * *.
"Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another. It is also not infrequently true that the discriminatory impact  in the jury cases for example, the total or seriously disproportionate exclusion of Negroes from jury venires  may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination *354 is very difficult to explain on nonracial grounds. Nevertheless, we have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule, McLaughlin v Florida, 379 US 184 (1964), that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations." (426 US, at 239, 241-242.)
In Arlington Hgts. (429 US, at 264-268), the Court stressed factors which indicate circumstantial and direct evidence of intent, including, whether the action bears more heavily on one race than another, a clear pattern, historical background, a sequence of events, statements of members of the decision-making body, minutes, and testimony of officials. Where the ultimate proof shows intentional discrimination through historical background, a pattern, disparate impact or other factors, plaintiffs would be entitled to relief.[5]
The Levittown Decision
In Levittown, this Court relied on the Rodriguez decision in applying a minimal or rational basis standard of review and in rejecting the claims of the plaintiffs that the Equal Protection Clause of the Fourteenth Amendment had been violated. Moreover, in Levittown, this Court noted the absence of any allegation that educational facilities or services fell below the minimum standard set by the Board of Regents. This Court stated:
"No claim is advanced in this case, however, by either the original plaintiffs or the intervenors that the educational facilities or services provided in the school districts that they represent fall below the State-wide minimum standard of educational *355 quality and quantity fixed by the Board of Regents; their attack is directed at the existing disparities in financial resources which lead to educational unevenness above that minimum standard." (57 NY2d, at 38.)
The difference between this case and Levittown is clear. In Levittown, there was no allegation that African-American, Latino or other students were receiving an education which was below the minimum standard. Here, the allegation of the lack of a minimal basic education is at the heart of the action as to all City public school students and that is why a majority upholds the Education Article cause of action.
In sum, I conclude that the plaintiffs have adequately stated a claim under the Equal Protection Clause of the Fourteenth Amendment. I also conclude that this Court is free to adopt a heightened scrutiny standard in dealing with the allegations of denial of a basic minimal education.

THE STATE EQUAL PROTECTION CLAIM

A.
Judge Ciparick and I conclude that the plaintiffs have stated a valid State equal protection claim. New York's historical and constitutional commitment to public education establishes education as an integral and substantial right of every citizen in our State, and a heightened level of scrutiny should be applied to review the current system of financing public education. In the procedural posture of this case, the allegations of the amended complaint are sufficient to allege that plaintiffs' equal protection rights, guaranteed by article I, § 11 of the New York State Constitution, have been violated by the State's funding methodology which denies New York City public school students a minimum adequate education. Therefore, for the current educational aid scheme to withstand intermediate review, defendants must demonstrate that the State's method of funding public education is substantially related to the important educational needs of its public school students.
While Judge Ciparick and I recognize that the distribution of educational aid is traditionally the bastion of the Legislature, we cannot overlook the allegations of the deleterious consequences of years of inequitable funding which have led to inadequate and substandard educational services. The allegation *356 is that a substantial number of New York City public school students do not receive the type of basic education necessary to equip them to exercise all of their established rights under the Federal and State Constitutions and to adequately function in society. In the 13 years since this Court's decision in Levittown, the gross disparities presaged by the Levittown majority are, allegedly, now a reality,[6] and, plaintiffs argue, it is painfully apparent that the Legislature refuses to address what has evolved into an epic constitutional problem,[7] rendering the application of heightened scrutiny particularly appropriate in this case (see, San Antonio School Dist. v Rodriguez, 411 US, at 99, 108 [Marshall, J., dissenting], supra; Dandridge v Williams, 397 US 471, 519-521 [Marshall, J., dissenting], reh denied 398 US 914; Bismarck Pub. School Dist. No. 1 v State of North Dakota, 511 NW2d 247, 259; Hubsch, The Emerging Right to Education Under State Constitutional Law, 65 Temp L Rev 1325 [1992]; accord, Levittown, 57 NY2d, at 39, supra; but see, Levittown, 57 NY2d, at 50, n 9, supra).
Assuming the truth of plaintiffs' allegations that New York City public school students are receiving an education below minimum standards because of an educational aid scheme that disparately impacts minority students through an inequitable *357 distribution of public moneys,[8] the focus of the inquiry of our dissent in this aspect of the case is whether New York's funding scheme which includes direct State funding and property-based funding furthers a substantial or important State interest to justify the discriminatory effects. It is alleged that the disparities in educational opportunities for urban public school children are a reality because the State's method of distributing aid bears no relationship, substantial or rational, to the educational needs of students or the costs of educating students in a particular district.
Since the State is constitutionally charged with providing an educational system that offers "a sound basic education" (Levittown, 57 NY2d, at 48, supra; NY Const, art XI, § 1), the failure to adequately fund New York City schools allegedly denies New York City public school students equal protection of the laws of this State in contravention of article I, § 11 of the New York State Constitution,[9] by depriving them of equal access to educational opportunities.[10] Under the current financing methodology, the quantum of taxable property in a school district bears an immediate and direct correlation to the student's access to education. Yet, according to plaintiffs, it is not the existence of disparities among districts that produces the unconstitutional inequity, but the fact that the financing scheme employed by the State to fund the system of free common schools perpetuates profound inequality of educational opportunity. Equal protection "is not addressed to the minimal sufficiency but rather to the unjustifiable inequalities *358 of state action." (San Antonio School Dist. v Rodriguez, 411 US, at 89 [Marshall, J., dissenting], supra.)
Pointing to Levittown, respondents contend that the disparities in funding among districts is the justifiable consequence of local control,[11] long recognized as the legitimate State interest underlying the complex school aid allocation formula.[12] However, these disparities, it is alleged, directly translate into a constitutionally unacceptable result  disparate and diminished educational opportunities for school children who, to their misfortune, reside in districts penalized under the current school aid allocation formula. It is this result  lesser educational opportunity which denies a sound, basic education, based on wealth discrimination  that allegedly transgresses the Equal Protection Clause of the State Constitution, and would require respondents to demonstrate at trial that the current school funding scheme bears an important and substantial relationship to the State's interest in preserving the current funding scheme and its rationale, which interest cannot be achieved through a less intrusive alternative (see, e.g., Montgomery v Daniels, 38 N.Y.2d 41, 61; Matter of Lalli, 43 N.Y.2d 65, affd sub nom. Lalli v Lalli, 439 US 259; People v Whidden, 51 N.Y.2d 457, 460; Califano v Webster, 430 US 313, 316-317; Craig v Boren, 429 US 190, 197, reh denied 429 US 1124; Alevy v Downstate Med. Ctr., 39 N.Y.2d 326, 336, supra).
This would be no easy task for respondents, complicated by strongly conflicted viewpoints and policies among the very agents who administer educational policy in New York. The *359 Commissioner of Education and the Board of Regents have characterized the school funding scheme as inequitable, charging that it undermines New York's educational policies. The Commissioner and Board of Regents have assailed the current financing formula for its arbitrariness, asserting that the current methods for allocating State education aid are ineffective and preclude attainment of proposed educational goals.[13]
Even under the benign gaze of rational review, the discriminatory impact of the current financing scheme on school children who reside in districts unable to commit substantial tax dollars to education, a fact exacerbated under the current school aid allocation formula, if proved, could not rationally be countenanced as furthering a legitimate State interest. Plaintiffs should be given the opportunity to prove their allegations in this aspect of the case as well as the one sustained by a majority of the Court.
Accordingly, I would reinstate the second cause of action alleging a violation of the Equal Protection Clause of the Fourteenth Amendment of the Federal Constitution. Judge Ciparick and I would reinstate the second cause of action insofar as it asserts a violation of the Equal Protection Clause of the State Constitution.
Order modified, without costs, in accordance with the opinion herein and, as so modified, affirmed.
NOTES
[1] Judges Simons, Titone, Bellacosa and Levine have concluded that the community school board plaintiffs lack capacity to bring this suit (see, City of New York v State of New York, 86 N.Y.2d 286 [decided today]), a conclusion with which Judge Smith and I respectfully disagree (see, id. [Ciparick, J., dissenting]). Consequently, all claims asserted on behalf of the community school board plaintiffs must be dismissed and the ensuing discussion applies only to the remaining plaintiffs in this action.
[2] Plaintiffs have abandoned this claim on this appeal.
[3] Supreme Court consolidated this action with City of New York v State of New York (86 N.Y.2d 286, supra [decided today]). In City of New York, essentially the same challenges were made to the State's education funding system as are made here, and Supreme Court dismissed the entire complaint for lack of legal capacity to sue.
[4] Judge Levine, in his concurrence, also concludes, for his own articulated reasons, that the Education Article requires the State to provide the opportunity of a "sound basic education". Contrary to his assertions, however, this decision does not extend the State's funding obligations (see, concurring opn, at 325). Judge Simons, in his dissent, also asserts that the majority opinion would compel a funding directive. However, any discussion of funding or reallocation is premature, because the only issue before the Court at this time is whether plaintiffs have pleaded a viable cause of action under the Education Article. The question of remedies is not before the Court.
[5] Judge Smith and I respectfully disagree and would sustain the second cause of action under the State Constitution in a separate opinion. Judge Smith, alone, further finds plaintiffs have stated a valid equal protection claim under the Federal Constitution.
[6] Plaintiffs' brief, at 30.
[7] Plaintiffs' brief, at 30.
[8] Plaintiffs' brief, at 39.
[9] Plaintiffs complain that 74% of the State's minority student population attend City schools, that minorities make up 81% of the City's public school enrollment as compared to 17% of school enrollment outside the City, and that the City's predominantly minority students receive 12% less State aid per pupil ($3,000) than the State-wide average ($3,400).
[1] Judges Titone, Bellacosa, Smith and Ciparick constitute the majority with respect to this cause of action.
[2] The regulations provide an extensive list of criteria which must be maintained by schools registered in the State. If an individual school falls below these standards, the Commissioner may review the school's registration, develop and implement a "comprehensive school improvement plan" and, if improvement is not satisfactory, may revoke the registration which is required of all public schools in the State (see, 8 NYCRR 100.2). The pleadings do not allege that the Commissioner has taken or threatens to take any of these steps with respect to any of the City's schools.

Significantly, many figures relied upon by plaintiffs to prove their point that an adequate education had not been provided are less substantial than figures relied upon by the Appellate Division and Judge Fuchsberg in Levittown (see, 83 AD2d 217, 250, 57 N.Y.2d 27, 50, supra).
[3] The majority questions this writing for discussing additional funding for the City School District, claiming that issue is not before the Court at this time (see, majority opn, at 316, n 4). I am at a loss to know what this litigation is about if it is not about additional funding for the City schools. Plaintiffs' complaint refers continually to the unfair and inadequate amount of State aid the New York City School District presently receives and certainly they will seek to receive more State aid to solve their local problems if they prevail in this litigation.
[1] See, Taylor v Board of Educ., 191 F Supp, at 198, n 4, supra).
[2] The Court in Rodriguez stated: "Texas asserts that the Minimum Foundation Program provides an `adequate' education for all children in the State. By providing 12 years of free public-school education, and by assuring teachers, books, transportation, and operating funds, the Texas Legislature has endeavored to `guarantee, for the welfare of the state as a whole, that all people shall have at least an adequate program of education. This is what is meant by "A Minimum Foundation Program of Education."' The State repeatedly asserted in its briefs in this Court that it has fulfilled this desire and that it now assures `every child in every school district an adequate education.' No proof was offered at trial persuasively discrediting or refuting the State's assertion." (411 US, at 24 [emphasis supplied].)

At another point in Rodriguez, the Court stated: "Even if it were conceded that some identifiable quantum of education is a constitutionally protected prerequisite to the meaningful exercise of either right, we have no indication that the present levels of educational expenditures in Texas provide an education that falls short. Whatever merit appellees' argument might have if a State's financing system occasioned an absolute denial of educational opportunities to any of its children, that argument provides no basis for finding an interference with fundamental rights where only relative differences in spending levels are involved and where  as is true in the present case  no charge fairly could be made that the system fails to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process." (411 US, at 36-37 [emphasis supplied].)
[3] In speaking of the effect of the denial of a basic education, the Court stated: "These well-settled principles allow us to determine the proper level of deference to be afforded § 21.031. Undocumented aliens cannot be treated as a suspect class because their presence in this country in violation of federal law is not a `constitutional irrelevancy.' Nor is education a fundamental right; a State need not justify by compelling necessity every variation in the manner in which education is provided to its population. See San Antonio Independent School Dist. v. Rodriguez, supra, at 28-39. But more is involved in these cases than the abstract question whether § 21.031 discriminates against a suspect class, or whether education is a fundamental right. Section 21.031 imposes a lifetime hardship on a discrete class of children not accountable for their disabling status. The stigma of illiteracy will mark them for the rest of their lives. By denying these children a basic education, we deny them the ability to live within the structure of our civic institutions, and foreclose any realistic possibility that they will contribute in even the smallest way to the progress of our Nation. In determining the rationality of § 21.031, we may appropriately take into account its costs to the Nation and to the innocent children who are its victims. In light of these countervailing costs, the discrimination contained in § 21.031 can hardly be considered rational unless it furthers some substantial goal of the State." (457 US, at 223-224.)
[4] It should be noted that the plaintiffs in CFE assert that they are not alleging the intentional discrimination that would require strict scrutiny. I read that statement to mean that they are not alleging overt, express discrimination.
[5] In his concurrence in Washington v Davis, Justice Stevens noted that the line between purposeful discrimination and disparate impact was not always bright, and, in some instances, where the disproportionate impact is great, the difference between purpose and effect would be "irrelevant" (426 US, at 253-254).
[6] Scholarly commentary has long criticized the inadequate educational services the inequitable distribution of resources has established as a legacy in urban centers in this State. The amici refer to the 1993 findings of the Swygert Commission which report that New York has created a dual system of education (see, brief of amici curiae, American Civil Liberties Union et al., at 2, citing Swygert, Putting Children First, New York State Special Commission on Educational Structures, Policies and Practices [1993]). It should come as no surprise that the austere fiscal policies of the past decade have only exacerbated the inequities wrought by the school funding scheme (see, Newman, Essentials Become Luxuries as Schools Cope with Budget Cuts, New York Times, Jan. 16, 1995, at B1, col 2).
[7] Plaintiffs allege that "[o]ver the past ten years, despite knowledge of the [gross disparities and glaring inadequacies], and despite recommendations for major reforms in official reports issued by commissions created by the defendants themselves, the defendants have re-enacted the inequitable state aid scheme without substantial modification to address the blatant inequities and their disproportionate impact on minority students, or to ensure that all students throughout the state of New York have available to them the resources necessary to obtain an education meeting or exceeding the Regents' minimum statewide standards. Defendants have refused to act, even though the detrimental impact of their failure to provide equitable levels of funding [to] minority students was well-recognized and reasonably foreseeable."
[8] Plaintiffs allege that approximately 74% of the minority public school population attend school in New York City and that minorities comprise 81% of the City's public school enrollment, compared with 17% in public schools outside New York City (record on appeal, at 71-72). Plaintiffs assert that educational services provided in New York City public schools fall below Regents' standards (record on appeal, at 72), and that New York City public school minority students receive below average scores on State-wide achievement tests in numbers disproportionate to nonminority students (id.). Therefore, plaintiffs charge that there is a racial dimension to this State's public school funding policy which impermissibly disadvantages minority students.
[9] The equal protection prong of this provision provides that "No person shall be denied the equal protection of the laws of this state or any subdivision thereof."
[10] Short of a fundamental right, education has nevertheless been hailed as "perhaps the most important function of state and local governments" (Brown v Board of Educ., 347 US 483, 493, supra), and that "New York has long been regarded as a leader in free public education" (Levittown, 57 NY2d, at 48, supra).
[11] In rejecting the State's contention that local independence of choice is supported by the current educational funding scheme, Justice Lazer observed: "[T]he quality of the educational opportunity offered by any particular district is largely determined by the amount of taxable property in the district. For the property-poor, local control of education is more illusory than real, for it cannot be utilized to produce the educational output local authorities perceive as appropriate but only what a limited local tax base will permit. * * * `[a] general policy of local control affords no real justification for maintaining a school finance ghetto' (Carrington, Financing the American Dream: Equality and School Taxes, 73 Col L Rev 1227, 1259)" (Levittown, 83 AD2d 217, 243).
[12] Plaintiffs characterize defendants' methodology for allocating State education aid as "an incoherent, unsystematic aggregation of 50 different formulas, categorical program fundings, flat grants, minimum aid ratios, caps, hold harmless guarantees and other inconsistent provisions which have emerged from decades of political compromises based on considerations unrelated to educational need or any principles of equity," that are inevitably renegotiated every year depending on the political winds (see, record on appeal, at 58, amended complaint ¶ 25).
[13] The Commissioner and Board of Regents have specifically discredited the current financing scheme because its formulation

"a. do[es] not provide adequately for all students, especially the most needy;
"b. [is] unduly complicated, with 53 separate formulas governing the distribution of aid;
"c. inhibit[s] local flexibility, since many kinds of aid require specific programs whether or not such programs are the best use of the money;
"d. entail[s] no accountability for results, because districts continue to receive the money no matter what;
"e. do[es] not deal adequately with local differences in wealth and cost;
"f. do[es] not adequately support needed improvements in teaching and learning * * *
"g. do[es] not foster interagency collaboration, since funds are allocated agency by agency, and rules for their distribution are separately defined;
"h. lack[s] public credibility, for all of these reasons" (record on appeal, at 59-60).